## JERVEY v. THE CAROLINA et al.

### (District Court, E. D. South Carolina. March 15, 1895.)

1. MARITIME TORT—ADMIRALTY JURISDICTION.

An illegal seizure of a vessel while lying at the dock is a maritime tort, giving a district court jurisdiction in admiralty of a libel to recover her.

2. INTERSTATE COMMERCE — INTERFERENCE WITH — SEIZURE OF BOAT TRANSPORTING LIQUOR AT NIGHT.

"Dispensary Act" S. C. Jan. 2, 1895, § 38, declaring that any boat or other conveyance transporting liquors at night, other than regular passenger or freight steamers and railroad cars, shall be liable to seizure and confiscation, is, in the case of a boat bringing liquor from another state, void, as an interference with interstate commerce.

3. SAME—EFFECT OF WILSON ACT.

The Wilson act of August, 1890, merely declared that imported packages of intoxicating liquor should, on their arrival in the state, become subject to the police power, equally with liquor produced therein, and gave no power to seize a boat having on board liquor which it had brought from another state.

4. COURTS—CONFLICT OF JURISDICTION.

The mere fact that a constable without process or warrant has seized a boat under Act S. C. Jan. 2, 1895, declaring that any boat transporting liquor at night shall be liable to seizure and confiscation, presents no conflict of jurisdiction on the owner libeling it, and therefore no reason why the federal court should remit him to the state court for his remedy.

Libel by Joseph E. V. Jervey, Sr., against the schooner Carolina and M. T. Holley, Sr.

J. P. K. Bryan, for libelant.

W. A. Barber, Atty. Gen. S. C., C. P. Townsend, and W. Gibbes Whaley, for defendant Holley.

BRAWLEY, District Judge. The schooner Carolina, a vessel of the United States, whereof Joseph E. V. Jervey, Sr., is owner, and which is duly enrolled and licensed for the coasting trade under the laws of the United States, sailed from the port of Savannah, in the state of Georgia, on the 18th day of February, 1895, and, crossing the bar of Charleston about 9 o'clock on the night of the 25th Febru-

ary, reached Palmetto wharf about 3 o'clock on the morning of the 26th, having on board six packages marked "whisky," and twenty-six packages marked "vinegar," which investigation proved to contain whisky. While lying in the dock, and before her cargo was unloaded, she was seized by M. T. Holley, Sr., chief constable of the state of South Carolina, under section 38 of the act of the general assembly of said state approved January 2, 1895, commonly known as the "Dispensary Act," which section is as follows:

"Sec. 38. Any wagon, cart, boat or other conveyance transporting liquors at night, other than regular passenger or freight steamers and railway cars, shall be liable to seizure and confiscation, and to that end the officer shall cause the same to be duly advertised and sold, and the proceeds sent to the state commissioner."

A libel in rem in a cause of possession was filed by Jervey, as owner, on the 27th of February. The answer of the defendant Holley, by the attorney general of South Carolina, filed March 5, 1895, avers that the seizure was lawful, and denies the jurisdiction of this court. Theodore G. Barker, intervening for his interest, claims that he advanced to Jervey the purchase money of said schooner, taking a mortgage thereon, which has been duly enrolled; that a balance of $560, with interest thereon from March 31, 1891, remains unpaid; and that by the stipulations of said mortgage the title to said schooner has vested in him.

The first question to be considered is that of jurisdiction. The constitution of the United States provides (article 3, § 2): "The judicial powers shall extend to all cases of admiralty and maritime jurisdiction." This clause, imputed to Charles Pinckney, was accepted by the framers of the constitution without debate and without dissent. The most vigilant defenders of the rights of the states, and the most jealous upholders of the rights of the people, intent upon preserving to them the right of trial by jury, and protection to person and property, and providing for its administration according to the course of the common law in all the material subjects of litigation, conceded to the courts of the United States jurisdiction in all admiralty and maritime cases, without exception as to subject or place. The intent of the framers of the constitution manifestly was to secure perfect equality in the rights and privileges of the citizens of the different states, not only in the laws of the general government, but in the mode of administering them. The sea belongs to no state. It is the joint property of the nations. And as the tranquillity, reputation, and intercourse between citizens of different states and foreign nations would be affected by admiralty decisions, it is essential that they should be uniform, and no uniformity could be expected if there were as many independent jurisdictions as there are distinct states. By the judiciary act of 1789 (Rev. St. § 563) congress vested this entire grant of judicial power in the district court: "The district court shall have jurisdiction of all civil causes of admiralty and maritime jurisdiction, saving the suitors in all cases the right of common law remedy when the common law is competent to give it, and such jurisdiction should be exclusive."

The supreme court of the United States, in The Moses Taylor, 4 Wall. 430, declares the reason why this grant should be exclusive: "Because it connects itself with diplomatic relations and duties to foreign nations and their subjects, with great interests, foreign and domestic, of navigation and commerce." And in The Belfast, 7 Wall. 643, it declares that the saving clause in this section operates as a privilege to the suitor to invoke a common-law remedy at his election. "It is to suitors, and not to state courts, nor to the circuit courts of the United States." Examined carefully, it is evident that congress intended by that provision to allow the party to seek redress in the admiralty if he saw fit to do so, but not to make it compulsory in any case where the common law is competent to give him a remedy, etc. And, comparing the common-law remedies, the court says: "But there is no form of action at common law which, when compared with the proceeding in rem in admiralty, can be regarded as a concurrent remedy;" and, referring to the question again, in Moran v. Sturges, 154 U. S. 276, 14 Sup. Ct. 1019, the court says: "This act saves to suitors in all cases the right of a common-law remedy where the common law is competent to give it;" that is, not a remedy in the common-law courts, but a common-law remedy. Suitors are not compelled to seek such remedy if it exist, nor can they, if entitled, be deprived of their right to proceed in a court of admiralty.

It being the manifest intention of the framers of the constitution to create a tribunal in the interest of commerce, and for its safety and convenience for the speedy decision of controversies where delay would be ruinous, and this court having been created with a jurisdiction, original, instant, plenary, and exclusive, it remains to consider whether this cause falls within its cognizance. Here is a schooner, duly enrolled as a United States vessel, sailing from the port of a neighboring state, over the high seas, laden with an undischarged cargo, her transit completed, but, until discharged, still occupied in the business of navigation, seized without a warrant or other process of law. In determining the jurisdiction of a court in admiralty, locality is the primary question, and the ship or vessel, in its uses, forms the central point, for the great interests of commerce are affected by such instruments, and these interests become subject to the regulations of maritime law, called maritime because the sea is the place of its operation. Says Justice Story in De Lovio v. Boit, 2 Gall. 398, Fed. Cas. No. 3,776: "These words include jurisdiction of all things done upon or relating to the sea, or, in other words, all transactions and proceedings relating to commerce and navigation and to damages and to injuries upon the sea." And Justice Clifford in Ex parte Easton, 95 U. S. 68: "It may now be said without fear of contradiction that it extends * * * to civil marine torts and injuries, * * * illegal dispossession or withholding of possession from the owners of ships, * * * municipal seizures of ships," etc. "Petitory as well as possessory suits are cases of admiralty and maritime jurisdiction. They may be brought in all cases to reinstate the owners of ships who have been wrongfully deprived of their property." Ben. Adm. pp. 176, 177, § 311; Ben.

Adm. p. 38. Torts on navigable waters of the United States are cognizable in admiralty. The test is locality. The Slavers, 2 Wall. 383. "We reaffirm the rule that locality is the true test of admiralty cognizance in all cases of marine torts, that if it appears as in cases of collision, ·*·:·*· * illegal dispossession of ships, * * * that the wrongful act was committed on navigable waters within the admiralty and maritime jurisdiction of the United States, then the case is one properly cognizable in the admiralty." The Belfast, 7 Wall. 640. Jurisdiction in torts "depends entirely upon locality. If the wrong be committed on the high seas, or within the ebb and flow of the tide, it has never been disputed that they come within the jurisdiction of that court. Even Lord Coke declares 'that of contracts, pleas, and querels made upon the sea, or any part thereof which is not within any county, the admiral hath, and ought to have, jurisdiction.'" Philadelphia, W. & B. R. Co. v. Philadelphia & H. S. Towboat Co., 23 How. 215. "Nor is the term 'tort,' when used in reference to admiralty jurisdiction, confined to wrongs or injuries committed by direct force, but it includes wrong suffered in consequence of the negligence or malfeasance of others, where the remedy in common law is by an action on the case." Leathers v. Blessing, 105 U. S. 630. In this case the only question raised was as to jurisdiction. The steamboat was lying at a wharf, securely moored thereto, with one of her gang planks out, and resting on the shore; and the libelant, having business on the boat, went aboard, when a bale of cotton fell upon him, breaking his leg. The court held that the fact that the boat was moored, and her gang plank ashore, did not make her a part of the land, or deprive her of the character of a water-borne vessel. Among the latest cases is that of Vanderbilt's yacht seized by the collector of the port of New York for nonpayment of duties, reported in Re Fassett, 142 U. S. 484, 12 Sup. Ct. 295, where the court uses this language: "The subject-matter of this libel is a marine tort, cognizable in a case of possession in admiralty by any district court of the United States which finds the vessel within the territorial limits of its process," and cites with approval The J. W. French, 13 Fed. 916, which was a case for restitution of a vessel seized and held under laws of the state of Virginia, which were held void.

It being clear that the conduct complained of is, if illegal, a marine tort, committed upon a vessel of the United States, and lying in the waters of the United States, this court cannot, consistently with its duty, refuse the jurisdiction with which it is clothed by the constitution and laws, where its aid is invoked by a party entitled to demand it. Its powers are limited to the inquiry and decision of the single question whether the seizure of the vessel under the circumstances was legal or illegal. It cannot pass upon the validity or invalidity of those police regulations whereby the state may undertake the control of the liquor traffic upon its soil. Between the citizens, claiming the right to sell liquor as "an inalienable right," and the state, asserting by strenuous legislation its right to a monopoly of that traffic, this court cannot interfere; nor, in the exercise of its function as a court of

admiralty, can it inquire what disposition is made of a cargo of liquor after it is landed. Whether it can be confiscated to the use of the state, and dispensed to its citizens, or whether it shall be poured out into the streets as a noxious poison, are questions solely for the determination of the proper authorities of the state; but every voyage of a vessel between two or more states is subject to the admiralty jurisdiction, and not to any state legislation. Vessel and cargo are agencies and articles of commerce, which, by the very terms of the constitution (article 1, § 8), are subject to the exclusive regulation of congress; and, until congress exercises such powers, all commerce between the states is free. This includes both transportation and commodites, with the single exception of nitroglycerine and other explosives, of which, by special act, the states may prohibit the introduction, sale, use, or consumption within their limits. That distilled liquor is a lawful article of commerce has been repeatedly decided by the courts of the United States; and the state of South Carolina, which is, perhaps, the largest wholesale and retail liquor dealer upon the continent, does not controvert that fact. The offense charged and penalty denounced against this vessel is that she transported this liquor in the nighttime. If it was a lawful article of commerce, can it be made an offense that this vessel, sailing upon the high seas, should avail herself of the lighthouses and range lights which the wisdom and beneficence of the government have provided in the interest of commerce? I have been but lately in the island of Cuba, which is held in the iron grasp of Spain. There are no lights there to guide the mariner to safe anchorage, and all vessels are forbidden to enter port at night; but despotic power holds with equal hand both great and small. Here it is the small and weak against which penalties are denounced; the great steamship comes and goes with impunity. Scarcely a week passes but there are reported seizures of liquor landed from steamships and railroad cars, but it is not contended that such steamships or cars are liable to confiscation. How, then, can this discrimination against sailing vessels in favor of other agencies of transportation be sustained? It is unnecessary to consider whether such discrimination is not obnoxious to the fourteenth article of the constitution of the United States, which secures to all citizens "the equal protection of the laws"; to the twelfth section of the bill of rights in the constitution of South Carolina, which forbids any "restraints or disqualifications in regard to any personal rights than such as are laid upon others under like circumstances." It will be considered simply in its aspect as a regulation of commerce, which is reserved by the constitution to the government of the United States. In Railroad Co. v. Husen, 95 U. S. 465, the supreme court considered and declared void a statute of the state which prohibited the driving or conveying any Texas cattle into the state. "Transportation," says Justice Strong (page 470), "is essential to commerce, or rather it is commerce itself, and every obstacle to it, or burden laid upon it, by legislative authority, is regulation." Henderson v. Mayor of New York, 92 U. S. 260, declares void a statute of New York requiring the master

of every vessel, within 24 hours of the landing of every passenger, to pay a commutation tax or give a bond to indemnify the state against any burden for the relief of indigent passengers. Says Justice Miller (page 271): "Nothing is gained in the argument by calling it the police power. It must occur very often that the shading which marks the line between one class of legislation and another is very nice, and not easily distinguishable. But, however difficult this may be, it is clear from the nature of this complex government that whenever a statute of a state invades the domain of legislation, which belongs exclusively to the congress of the United States, it is void, no matter under what class of powers it may fall, or how closely it may be allied to powers conceded to belong to the states." In the last expression of the supreme court on this subject (Brennan v. City of Titusville, 153 U. S. 289, 14 Sup. Ct. 829) the opinion of the supreme court of Pennsylvania sustaining an ordinance imposing a license tax upon drummers was reversed, and Justice Brewer, delivering the opinion of the court, says: "Even if it be that we are concluded by the opinion of the supreme court of the state that this ordinance was enacted in the exercise of police power, we are still confronted with the difficult question as to how far an act held to be a police regulation, but which affects interstate commerce, can be sustained." And his conclusion is that "it is settled that nothing which is a direct burden upon interstate commerce can be imposed by the state without the assent of congress, and that the silence of congress in respect to interstate commerce is equivalent to a declaration on its part that it shall be absolutely free." Any other view would defeat the object desired. When the constitution was adopted, the necessity for uniformity of regulations in all that concerned the transportation and exchange of commodities led to the conferring of the power to regulate commerce upon congress; otherwise there would be no security against conflicting regulations of the different states. If the state of South Carolina can discriminate among the classes of vessels which may enter her ports with merchandise, and the time when they shall enter, other states may discriminate in favor of their own products, and as to the class of vessels that may transport them, and there would be no limit to conflicting and discriminating state legislation.

The decisions of the supreme court on this subject have been so recently set forth in the able opinion of the circuit judge within this jurisdiction, in the habeas corpus Case of Jervey, 66 Fed. 957, that it would be a work of supererogation to make further comment thereon. Inasmuch, however, as the learned assistant to the attorney general has pressed upon the court the view that the Wilson act (August, 1890) has made a radical change in the law respecting interstate commerce, it may be well to consider the effect of that legislation. This act did no more, and purported to do no more, than to declare that imported packages of intoxicating liquor should, upon their arrival in the state, become subject to the police power equally with liquors produced therein. The supreme court had decided in Leisy v. Hardin, 10 Sup. Ct. 681, that

such imported packages could be sold when domestic liquor could not be sold. The Wilson act puts both upon the same plane; it does not prohibit importation; it leaves commerce free and untrammelled as before. In construing said act the supreme court in Re Rahrer, 140 U. S. 564, 11 Sup. Ct. 865, says: "Congress did not use terms of permission to the state to act, but simply removed an impediment to the enforcement of the state law in respect to imported packages in their original condition, created by the absence of a specific utterance on its part. It imparted no power to the state not then possessed, but allowed imported property to fall at once upon arrival within the local jurisdiction." The court had previously decided in Bowman v. Railway Co., 8 Sup. Ct. 689, that "the power to regulate or forbid the sale of a commodity, after it has been brought into the state, does not carry with it the right and power to prevent its introduction by transportation from another state." This decision is unaffected by the Wilson act, or by any decisions made since its passage. In the sense of the statute under consideration, there was no introduction and arrival of packages of liquor aboard this schooner. The proof offered by the state shows that the schooner had cut her lines, and was leaving the dock, when a pistol shot was fired across her, and she was seized by the constables. Not a single package had been discharged. But for such arrest she would have been free, upon finding that her cargo could not be landed, to carry it back to the place of shipment or to another market. Wherever ships float and navigation aids commerce they are under the protection of the law which declares that commerce must be free. It is true that the schooner was a small one, but she was not much smaller than that in which Columbus sailed to the discovery of this continent, and larger than that in which the Vikings crossed. This court knows of no law which permits it to discriminate as to the size of vessels entitled to invoke its protection; and the learned counsel for the state, whose research has known no limit, presents no authority for such discrimination. He has presented the case in another aspect, which demands consideration. He asks that this court should stay its hand, and allow the libelant to seek his remedy in the courts of the state. In support of this view he relies upon the case of Taylor v. Carryl, 20 How. 616. In that case the vessel had been seized under a process of foreign attachment, issued from a state court in Pennsylvania. The sheriff was in possession, and a motion was pending for a sale. Under such circumstances the court held (Chief Justice Taney and three other justices dissenting) that it would relinquish its jurisdiction in favor of the state court already in possession of the property. He also cites the case of Moran v. Sturges, 154 U. S. 257, 14 Sup. Ct. 1019. In that case proceedings had been commenced in the supreme court of New York, and a receiver appointed of a corporation organized under the laws of that state. Libels against certain towboats, the property of this corporation, were filed subsequent to the appointment of the receiver, when an injunction restraining libelants was issued by the supreme court (19 N. Y. Supp. 565), which was af-

firmed ·by the court of appeals (32 N. E. 623). Upon appeal to the supreme court of the United States these proceedings were set aside, and the jurisdiction of the United States district court asserted to be exclusive, the state court being without jurisdiction as to maritime liens. The principle upon which the court acted in Taylor v. Carryl in relinquishing its jurisdiction to the state court was simply a rule of comity, as has been repeatedly asserted in comments upon that decision. There is a comity between courts, and there is what is known as a· comity of nations, which leads one country to give effect within its territory to certain laws and institutions of another state as a matter of courtesy; and so, where there are two courts of concurrent jurisdiction, it is customary and courteous for one court to abstain from interference with that· which first obtains jurisdiction.

In this case there was no process in the state court, no warrant. The constable seized with a strong hand, dispossessed the owner, and was proceeding summarily to confiscate. There is, therefore, no conflict of jurisdiction between the judicial tribunals of the state and of the United States. It is not a question of comity, but of duty. This court assumes that the courts of the state would not refuse relief to any citizen entitled to their protection, but the delays unavoidably incident to courts of common law in their rules and mode of proceeding are ofttimes equivalent to a denial of justice, and for this reason, in the great majority of cases, seafaring men seek their remedies in the courts of admiralty. Having a choice of jurisdiction, the libelant has sought his remedy in this court. The court has no option to grant or withhold relief in a case clearly within its jurisdiction. It is adjudged that so much of the act of January, 1895, under which this vessel was seized, is null and void as an interference with interstate commerce, and that the libelant is entitled to a decree for possession and for his costs.