Purchase v. State.

---

EUGENE PURCHASE v. STATE OF NEBRASKA.

FILED DECEMBER 30, 1922.   No. 22790.

1. Commerce: TAXATION.  "Interstate commerce cannot be taxed at all by a state, even though the same amount of tax should be laid on domestic commerce, or that which is carried on solely within the state."   *Robbins v. Shelby County Taxing District*, 120 U. S. 489.

2.    ———: REGULATION.  "The power granted to congress, to regulate commerce among the states, being exclusive when the subjects are national in their character, or admit only of one uniform system of regulation, the failure of congress to exercise that power in any case is an expression of its will that the subject shall be left free from restrictions or impositions upon it by the several states."   *Robbins v. Shelby County Taxing District*, 120 U. S. 489.

3.    ———: REGULATION: POWERS OF STATES.  "A state may enact laws which in practice operate to affect commerce among the states—as by providing in the legitimate exercise of its police power and general jurisdiction, for the security and comfort

of persons and the protection of property; by establishing and regulating channels for commercial facilities; by the passage of inspection laws and laws to restrict the sale of articles injurious to health and morals; by the imposition of taxes upon avocations within its borders not interfering with foreign or interstate commerce or employment, or with business exercised under authority of the Constitution of the United States." *Robbins v. Shelby County Taxing .District*, 120 U. S. 489.

4. ——: INTERSTATE COMMERCE. To take orders for goods in one state which are to be shipped from another state is an incident of interstate commerce and comes exclusively under federal control and is therefore not subject to the burden of state legislation.

5. ——: OBNOXIOUS RULINGS: RELIEF. In all that relates solely and peculiarly to the actual regulation of interstate commerce, the congress, and not the courts, must be applied to for relief from a rule of law which may to some appear to be obnoxious, or to obtain relief by affirmative legislation as the need of the exigency may require.

ERROR to the district court for Cass county: JAMES T. BEGLEY, JUDGE. *Reversed and dismissed.*

*Crofoot, Fraser, Connolly & Stryker,* for plaintiff in error.

*Holmes, Chambers & Mann, contra.*

Heard before MORRISSEY, C.J., LETTON, ALDRICH, DEAN and DAY, JJ., REDICK and SHEPHERD, District Judges.

DEAN, J.

Eugene Purchase, defendant, is the agent of the Grand Union Tea Company, a New Jersey corporation, which has its general headquarters in New York city and conducts a branch house at Omaha. In October, 1921, as an employee of the manager of the Omaha branch, and as agent of the tea company, defendant took orders in Louisville from each of three or more residents of the village for five packages of coffee, each containing five pounds, which he delivered about two weeks thereafter, at which time he accepted from each of the purchasers $2 in payment therefor. For effecting the sales and the

deliveries so made, without first having paid a prescribed occupation tax, defendant, upon complaint being filed, was fined $10 by the police magistrate, which upon appeal was affirmed by the district court.

Defendant's contention is that the transaction herein complained of constituted interstate commerce, and that his arrest and the fine imposed were therefore violative of the federal Constitution relating to that subject. To have the proceedings reviewed, a petition in error has been filed in this court.

The municipal ordinance in question contains this among other provisions: "Retail sellers of goods and merchandise and peddlers not having a permanent place of business in this village, whether said goods and merchandise are sold by sample or by taking orders or otherwise, per day, two ($2) dollars, this not to include commercial travelers, selling to dealers only." The penalty for a violation of the ordinance is a fine of not less than $5 nor more than $100.

In addition to the preceding statement of facts, the stipulation on which the case was tried, sets forth that defendant, as agent of the company, traveled in an automobile furnished by the company when taking the orders and also in transporting the five-pound coffee orders from Omaha to Louisville; that the purchasers were not engaged in the retail business at Louisville at any time herein mentioned, nor was defendant at the time a commercial traveler selling goods to dealers in Louisville; that the tea company is a seller of goods prepared and manufactured by Jones Brothers Company, a New York corporation; that the goods when manufactured are packed and marked with the label of the Grand Union Tea Company and delivered to it at the factory, from which place they are forwarded by the tea company for sale and distribution to various parts of the United States; that the tea company sells a small part of its merchandise at retail in its Omaha store; that the principal part of its business in Nebraska is done through

solicitors who go regularly from place to place on fixed
routes soliciting and taking orders for future delivery;
that the orders for each of the five-pound packages of
coffee were delivered by defendant personally to the
Grand Union Tea Company's Omaha store, where they
were accepted and approved by the manager, and such
five-pound packages were filled from larger fifty-pound
cartons or containers of bulk coffee which had been
shipped from Brooklyn, New York, a distributing point
of the tea company, and consigned to itself at Omaha;
that the five-pound coffee packages were delivered to de-
fendant, who in turn delivered them to the Louisville
customers, from whom he collected the purchase price;
that for his services defendant was allowed a certain
percentage of the original price as a commission; that
he did not sell the coffee at retail from his said auto-
mobile in any other manner than by taking orders for
future delivery; that in the event said five-pound coffee
orders had not been accepted by the Louisville customers
they would have been returned to the Omaha store and
placed in stock for sale over the counter; that the "fifty-
pound cartons of bulk coffee which were broken to fill
the five-pound orders of said Louisville, Nebraska, cus-
tomers after they had been delivered by the carrier to
the Omaha store were shipped to and addressed to Grand
Union Tea Company, Omaha, Nebraska, and were not
consigned at Brooklyn, New York, the distributing point
of said Grand Union Tea Company, to said defendant
nor to said Louisville, Nebraska, customers;" that the
five-pound coffee packages were the property of the com-
pany, charged to the account of its Omaha branch, until
actually delivered to the Louisville customers; that all
cards, memoranda or information concerning the Louis-
ville customers belong to the Grand Union Tea Company;
that the Omaha store does not keep a stock of goods on
hand with which to fill all orders taken by its solicitors.

The stipulation in part, and more particularly that
part which follows, we are informed by the brief of de-

fendant, is adapted almost verbatim from the opinion in *Grand Union Tea Company v. Evans,* 216 Fed. 791, and reads: "The Omaha store does not keep a stock of goods on hand with which to fill all orders taken by its solicitors, but experience has shown the manager thereof about how many orders will come in each day and each week in the usual course of trade, and in order to fill the continually recurring orders he will anticipate by a few days only the procurement of goods sufficient to fill such orders by ordering them from a distributing point of the Grand Union Tea Company at Brooklyn, state of New York. All goods are ordered from Brooklyn, in the state of New York, in no greater amount than is necessary to fill the recurring orders received in the usual course of trade, and so as to match orders which are being taken when the goods to fill them are in transit, the goods do not arrive at the store in Omaha until after the orders from the customers have actually been taken and probably one-half thereof actually received by the Omaha store manager, and that all of the merchandise involved in this action was outside the state of Nebraska at the time the orders were taken and were later filled from those goods. Coffee is usually received in bulk in fifty-pound packing cases, cartons or parcels, which are unpacked in the Omaha store and kept separate and apart from the goods held for local sales. Said five-pound coffee orders in controversy received personally from defendant, and accepted and approved by the manager of the Omaha store, were filled from said fifty-pound cartons by the employees of the Omaha store. At the time said five-pound coffee orders from said Louisville, Nebraska, customers in controversy were received from said defendant and accepted and approved by the manager of the Omaha branch of said Grand Union Tea Company at Omaha, Nebraska, on or about October 14, 1921, until on or about October 28, 1921, when said orders were filled, there was over 25 pounds of coffee on hand in said Omaha, Nebraska, warehouse, but same was intended for

and used to fill orders for other customers. Said orders were filled from broken original packages in five-pound lots to suit the orders of the several Louisville, Nebraska, purchasers previously taken. Said fifty-pound cartons of coffee from which said orders were filled had heretofore been brought into the state of Nebraska in interstate commerce. Said five-pound packages of coffee delivered to Mrs. John Davis, Mrs. Clara Grassman, Mrs. Emily Benedict, and others, in said village on October 28, 1921, 'by defendant were not in the same form and condition as when received by the manager of the Grand Union Tea Company at Omaha, Nebraska. The original orders taken from said Louisville, Nebraska, customers were never transmitted to the distributing point of the Grand Union Tea Company at Brooklyn, New York."

In support of the argument, counsel for the village cite *In re Agnew,* 89 Neb. 306, and contend that under that decision the judgment of the district court must be affirmed. The argument is not persuasive. In the *Agnew* ·case the original packages of goods included in the for-·eign shipment were broken by the consignee upon arrival, and the contents, in smaller units, which consisted of many small five cent packages of crackers, were displayed and offered for sale in this state by Agnew at his place of business "in his regular retail trade, singly or in numbers to suit his customers." We there held that the goods, when so submitted to the trade in the usual course of 'business, became a part of the commerce of the state and were, of course, as such, subject to the police power· under the pure food law. *In re Page,* 89 Neb. 299, is a companion case which is substantially to the same effect. Neither case is in point.

The present case presents a different state of facts.· The stipulation, *inter alia,* specifically discloses "that all of the merchandise involved in this action was outside of Nebraska at the time the orders were taken and were later filled from those goods."

In *Caldwell v. North Carolina,* 187 U. S. 622, it was held that a transaction, such as the one under discussion, is not deprived of its interstate character, even though the articles were sent from another state to the vendor's agent, for delivery to the purchaser, instead of being sent directly to the purchaser. It is there said that if the vendor had sent the articles by express it would not have subjected the transaction to state taxation, and the fact that they were sent as freight and received by an agent who made the delivery to the purchaser did not change the interstate character of the transaction. It is to be remembered, too, that in the case before us the goods were shipped by the company to itself at Omaha, and that the title did not pass to the respective purchasers until the goods were actually delivered to them by defendant at Louisville. *Caldwell v. North Carolina,* 187 U. S. 622.

True, the five-pound coffee packages were made up from coffee taken out of the fifty-pound cartons or containers, but that was a mere incident, a detail in the transaction, as shown by adjudicated cases herein cited, which does not affect interstate character and is therefore not controlling. In *Grand Union Tea Co. v. Evans,* 216 Fed. 791, hereinbefore cited, the fundamental principle is emphasized, namely, that the fact of taking orders in one state for goods to be shipped from another state constitutes interstate commerce, "exclusively under federal control and not subject to the burden of state legislation." The writer goes on to say that the general principles involved have so often been announced by the supreme court of the United States as "to cause them to be elementary. *Browning v. City of Waycross,* 233 U. S. 16, decided April 6, 1914. The sole question, therefore, in any given case, is whether the manner in which the business is carried on comes within the rules laid down." *Crenshaw v. State,* 227 U. S. 389; *Stewart v. People,* 232 U. S. 665; *Mt. Holly Springs Borough v. Wilt,* 43 Pa. Co. Ct. 566.

*Robbins v. Shelby County Taxing District,* 120 U. S. 489, is a leading case. Mr. Justice Bradley wrote the opinion for the court, and among other things, said: "The negotiation of sales of goods which are in another state, for the purpose of introducing them into the state in which the negotiation is made, is interstate commerce." Certain principles were then elaborately discussed as having been established by the decisions of the court. Among these was that the federal Constitution having given to congress the power to regulate commerce among the several states, that power is necessarily exclusive in matters pertaining to subjects which are national in their character, and that even though congress, in view of its exclusive jurisdiction, may fail to make express regulations, its silence shall be taken to indicate that its will is that the subject shall be left free from any restrictions or impositions by the states. An exception is noted, however, in the *Robbins* case as to matters of local concern only, and which may "incidentally affect commerce, such as the establishment and regulation of highways, canals, railroads, wharves, ferries, and other commercial facilities; the passage of inspection laws to secure the due quality and measure of products and commodities; the passage of laws to regulate or restrict the sale of articles deemed injurious to the health or morals of the community." The opinion concludes: "In a word, it may be said that in the matter of interstate commerce the United States are but one country, and are and must be subject to one system of regulations, and not to a multitude of systems. The doctrine of the freedom of that commerce, except as regulated by congress, is so firmly established that it is unnecessary to enlarge further upon the subject."

In *Brennan v. Titusville,* 153 U. S. 289, at page 302, it is said: "It is undoubtedly true that there are many police regulations which do affect interstate commerce, but which have been and will be sustained as clearly within the power of the state; but we think it must be

considered, in view of a long line of decisions, that it is settled that nothing which is a direct burden upon interstate commerce can be imposed by the state without the assent of congress, and that the silence of congress in respect to any matter of interstate commerce is equivalent to a declaration on its part that it should be absolutely free."

*Jewel Tea Co. v. Lee's Summit,* 189 Fed. 280, is strikingly in point. Complainant owned a Chicago store and employed an agent who went from house to house in defendant city soliciting orders for tea, coffee, and other like articles. The orders were reported by mail to the Chicago house by the agent, but he did not give the names of the prospective purchasers, merely stating in his report that a certain number of purchasers would each take a pound or more of tea or coffee or other articles as the case might be. Upon receipt of the orders the articles were each put up in cartons or packages corresponding to the orders, and the separate packages so wrapped were all placed in a large box and shipped to Kansas City, where the required number were taken out and reshipped to the agent at the defendant city, who delivered the goods, collected the price, and took new orders for the next delivery. After a hearing on the merits the defendant city was enjoined from enforcing an ordinance requiring a license of $1 a day for selling merchandise from wagons. The following excerpt taken from the *Jewel Tea Co.* case may perhaps be of interest to those having in charge the administration of municipal affairs:

"Ordinances, as well as statutes, like this, are in all instances artfully drawn, and their fairness and equality insisted upon. But courts do not observe mere words or phrasing, but look to the substance, effect, and meaning, and, when those are ascertained, enforce the rights of the parties. . The ordinance in question is clearly one to compel the people, in the interest of local merchants and middlemen, to buy their necessities from them; and be-

cause of such influences, the officers first adopt, and then seek to enforce, such regulations, so as to eliminate outside venders of merchandise, including the necessary articles of food for every family table. The stale argument that the local resident, who votes, and who pays the taxes, and otherwise maintains the town, and bears the local burdens, should be given these privileges as against the outsider and nonresident, is in all such cases strongly urged. The tax of $1 per day is not intended as a measure to raise revenue, but is intended to be, as it will be, if enforced, a measure to prohibit all kinds of competition by outsiders. There is nothing new in all this. It was done by New York and Rhode Island before we had a government. It was the central thought for the creation of our government; and because of such interference the commerce clause was put in our national Constitution, giving to congress, and it alone, the power to regulate commerce between the states."

In dealing with the facts before us we have looked to the substantial rights of the parties, as they were created by the federal Constitution, and have applied the law, as interpreted by the federal courts, to the substance of the transaction. To be sure the fifty-pound cartons of coffee were broken upon arrival at Omaha and the five-pound packages were made therefrom. In the *Grand Union Tea Company* case the same thing was done. But neither in that case nor in the present case has the spirit of the law been violated, but its real meaning and its true intent has been applied.

The sum of the whole matter is that, in all that relates solely and peculiarly to the actual regulation of interstate commerce, the congress, and not the courts, must be applied to for relief from a rule of law which may to some appear to be obnoxious, or to obtain relief by affirmative legislation as the need of the exigency may require.

It clearly appears that the defendant was wrongfully arrested and that the fine was unlawfully imposed. An

examination of the record leads us to conclude that the ordinance imposes a burden upon interstate commerce and is therefore unconstitutional and void.

It follows that the judgment of the district court must be and it hereby is reversed, with directions that the action be dismissed.

REVERSED AND DISMISSED.