UNITED STATES v. HOPKINS et al.

(Circuit Court, D. Kansas, First Division. September 20, 1897.)

1. MONOPOLIES AND RESTRAINTS OF TRADE.

In a suit to restrain alleged violations of the law of July 2, 1890, against trusts and monopolies affecting interstate commerce, the existence of an illegal combination among the defendants is to be determined not alone from what appears on the face of the preamble, rules, and by-laws of their association, but from the entire situation, and the practical working and results of their methods of doing business, as disclosed by the evidence.

2. SAME—LIVE-STOCK EXCHANGE.

The defendants were members of a voluntary, unincorporated exchange or association at Kansas City, and had agreed to be bound by its articles of association, rules, and by-laws. Their business consisted in receiving, buying, selling, and handling, as commission merchants, live stock received at the Kansas City stock yards from, and sold for shipment to, various states and territories. These stock yards furnished the only available public market for that purpose for an exceedingly large area, including many states and territories. One of the rules of the association fixed a minimum rate of commissions to be charged by members of the association, and prohibited the employment, by any commission firm or corporation, of more than three persons to travel and solicit business, and prohibited the sending of prepaid telegram or telephone messages quoting the markets; and another rule shut out all dealings and business intercourse between members and nonmembers. Persons attempting to carry on business without joining the exchange were systematically blacklisted and boycotted, and thus effectually prevented from securing or transacting business. Held, that the association was an illegal combination to restrict, monopolize, and control that class of trade and commerce.

3. SAME—REASONABLENESS OF RESTRAINTS.

The act of congress is aimed against all restraints of interstate commerce, and its purpose is to permit commerce between the states to flow in its natural channels, unrestricted by any combinations, contracts, conspiracies, or monopolies whatsoever. The reasonableness of the restrictions in a given case is immaterial.

4. COMMERCE BETWEEN THE STATES.

The fact that the place of business of an association is located upon both sides of the line dividing two states is in itself of no material importance in determining whether the business transacted by it is commerce between the states.

5. SAME.

The shipments of live stock from growers, dealers, and traders in various states and territories to the defendants was solicited by the latter chiefly through personal solicitation of traveling agents, and through advertisements. The course of business involved frequent loans to shippers in other states, secured by chattel mortgages on herds, and frequent drafts drawn by shippers on the defendants, and discounted at their local banks in other states on the strength of bills of shipment attached thereto. Shipments were made to Kansas City, and the loans or drafts paid from proceeds of sale, and the balance remitted to the shippers. Sales at Kansas City were made for shipment to markets in other states, as well as for slaughter at packing houses near by. The traffic was of immense proportions, and defendants were active promoters, and frequently interested parties, and gathered in for sale and slaughter millions of cattle, sheep, and hogs; and their rules and regulations covered the entire business, and extended over the whole field of operation. Held, that defendants were engaged in commerce between the states, and were subject to the provisions of the law of July 2, 1890, against trusts and monopolies.

6. SUBJECTS OF INTERSTATE COMMERCE.

The live stock shipped to defendants from other states through their solicitation and procurement, to be sold to a large extent for reshipment to

82 F.—34

other states, or, if the market should be unsatisfactory, for reshipment for sale at markets in other states, does not cease to be the subject of interstate commerce as soon as it reaches Kansas City or is there unloaded, nor until it has been so acted upon that it has become incorporated and mingled with the mass of property in the state.

**7. SAME—SUBJECTS OF INTERSTATE COMMERCE.**

Live stock shipped from various states to the yards of a stock-yards association in another state, by the solicitation and procurement of the members thereof, to be there sold, or to be reshipped to other states, if the market should be. unsatisfactory, does not cease to be a subject of interstate commerce as soon as it reaches such yards and is there unloaded, nor until it has been further acted upon so as to become mingled with the mass of property in the state.

The bill in this case is presented under the act of congress of July 2, 1890 (26 Stat. 209).

It charges that each of the defendants, about 300 in number, are members of a voluntary, unincorporated association, known and designated as the "Kansas City Live-Stock Exchange," and have adopted articles of association and rules and by-laws whereby they have agreed that they will faithfully observe and be bound by the same; that the government of said association is vested in a board of 11 directors, and its officers, consisting of a president, vice president, secretary, and treasurer; its place of business is in a building situated on the line between the states of Missouri and Kansas, and that defendants transact business partly in one state and partly in the other; that substantially all of the business transacted in the matter of receiving, buying, selling, and handling live stock at the Kansas City Stock Yards is carried on by defendants and other members of said exchange, as commission merchants; that a large proportion of such live stock is shipped from the states of Kansas, Nebraska, Colorado, Texas, Missouri, Iowa, and Arkansas,. and the territories of Oklahoma, Arizona, and New Mexico, and is sold by the defendants to the various packing houses in Kansas City, Mo., and Kan., and also for shipment to other markets; that a vast number of live stock is thus annually received and sold; that said Kansas City market is a public market, and supplies a large number of packing houses in Kansas City, Kan., and Kansas City, Mo., and other cities in different states of the Union; that the Kansas City market, next to Chicago, is the largest live-stock market in the world; that, under the practice and custom at said yards, the live stock there received is delivered to commission merchants, who receive, handle, sell, or' reship the same for the consignors and owners thereof to other states and territories, charging a commission for their services; that, in the course of business at said yards, said stock is moved and shifted from one state to the other, according to the convenience of said Kansas City Stock-Yards Company; that a large portion of said stock is incumbered by mortgages, executed by the owners thereof to the defendants, members of said exchange, who advance large sums of money to growers and owners of cattle to provide the means to feed and prepare it for the market; that, when such cattle are ready for shipment, they are consigned to the defendants and other members of said exchange, who have made such advancements, and the amount thereof and interest is deducted from the proceeds of sale; that 90 per cent. of the members of said exchange make such advancements; that said stock yards accord to owners and shippers of live stock the only available means at that place for handling, selling, and reshipping live stock; that, by reason of its situation, said Kansas City Stock Yards are the only available public market for the purchase and sale of live stock for an exceedingly large territory of the United States, and the only available means for the exchange of interstate traffic between the states and territories named, the stock being sold in said yards to be shipped to other states of the Union; that it is the custom among a large number of cattle growers and shippers who consign live stock to the Kansas City Stock Yards to draw drafts on the commission merchants to whom such stock is consigned, and, attaching the bill of lading issued by the carrier therefor, to draw money on said drafts from local banks, and, when presented to the consignees, said drafts are paid by

them in Kansas and Missouri, and the proceeds remitted to the banks in the various towns and cities where the live stock was shipped: that by reason of the fact that said yards are in the states of Missouri and Kansas, and the live stock handled and sold therein is at times in Kansas, and at others in Missouri, and are transported from different states to be sold and shipped to other states, said business is interstate in character, and can only be controlled by federal legislation, as a part of commerce between the states. The bill further charges that, if the person or partnership to whom live stock is consigned at Kansas City is not a member of said exchange, he is not permitted to sell or dispose of such live stock on the Kansas City market, for the reason that the defendants and all other commission merchants doing and controlling the business at said yards are required by the rules of said exchange to refuse to buy live stock or in any manner deal with a person who is not a member of said exchange, and in all such cases the owner of the live stock is compelled to reship the same to some other market, and, by reason of said unlawful combination, is prevented from delivering said live stock to the Kansas City Stock Yards; and the sale of the same is thereby hindered and delayed, extra expense and loss entailed to the shipper, and an obstruction placed upon the marketing of such live stock; that among other rules for the government of said exchange are the following:

"Rule IX. Commissions.

"Section 1. The commissions charged by members of this association for selling live stock shall not be less than the following named rates:

"Sec. 2. Six dollars per car load for single-deck car loads of hogs or sheep, and ten dollars per car load for double-deck car loads of the same: provided, members of this exchange may, after charging commissions as above provided, pay a regular sheep salesman on these yards a sum of money contingent on number of sheep sold. Said sheep salesman may be in the employ of other members of the exchange.

"Sec. 3. Fifty cents per head for cattle of all ages. In car loads of twenty-four or more, not more than twelve dollars per car load; ten dollars per single-deck car loads, and eighteen dollars per double-deck car load of veal calves.

"Sec. 4. Fifty cents per head for cattle, and twenty-five cents per head for calves, and ten cents per head for hogs and sheep in mixed car loads, but not to exceed twelve dollars per car load. Fifty cents per head for cattle and twenty-five cents per head for calves driven into the yards; and ten cents per head for hogs and sheep for sixty head or less. More than that number shall be charged for at car load rates.

"Sec. 5. Fifty cents per head for buying cattle for stockers or feeders: provided, such charges shall not exceed twelve dollars per car load. Six dollars per single-deck car load for buying sheep, and ten dollars per double-deck car load. All purchases paid for by a commission house or shipping clearance made by same shall be deemed a purchase, and charged for as above provided.

"Sec. 6. Not less than four dollars per single-deck and five dollars per double-deck car load for buying live hogs, and not less than three cents per head for hogs bought by the head.

"Sec. 7. No member or commission firm or corporation represented herein shall do business for a yard trader or speculator on this market for less charges than one-half the regular commission.

"Sec. 8. No firm shall handle the business of a nonresident commission house for less than full commissions, except said consignments be made direct to said nonresident commission house from one of the following named markets: Chicago, Ill.; East St. Louis, Ill.; St. Louis, Mo.; Omaha, Nebraska; Wichita, Kans.; Denver, Col.; Pueblo, Col.; St. Joseph, Mo.; Sioux City, Ia.; Peoria, Ill.; Milwaukee, Wis.; and Ft. Worth, Tex.

"Sec. 9. No member of this exchange or firm or corporation represented herein shall cause or allow to be shipped in his or its name any kind of live stock for the purpose of violating any of the provisions of this rule.

"Sec. 10. No agent, solicitor, or employé shall be hired except upon a stipulated salary, not contingent upon commissions earned (save as provided in section 2 of this rule). No solicitor shall be employed except as a bona fide traveling agent, who shall not solicit consignments local to his own neighbor-

hood only, nor to secure his individual trade. Nor shall any agent, solicitor, or employé be hired who is employed by any other party or parties, or who is actively engaged in other business (save as provided in section 2 of this rule). Members of this exchange must file with the secretary, within five days of employment, the names and addresses of their solicitors. More than three solicitors shall not be employed at one time by a commission firm or corporation. Members of a commission firm or corporation—resident or nonresident of Kansas City—may travel as solicitors, but must be registered as one of the three allowed each firm or corporation. It shall be a violation of this rule for any solicitor representing or claiming to represent a commission firm or corporation in any other market to solicit for any Kansas City firm; and members shall be held accountable for the acts of any solicitor who, under the guise of· soliciting for a branch house, solicits for a Kansas City firm or corporation.

"Sec. 11. Any member of this association or firm or corporation represented herein, sending or causing to be sent a prepaid telegram or telephone message quoting the markets, giving information as to the condition of the same, shall be fined not less than $100 nor more than $500. If said fine be not paid within three days, said firm or member shall be suspended until said fine is paid: provided, however, that prepaid messages may be sent to shippers quoting actual sales of their stock on the day made; also, to parties desiring to make purchases on this market.

"Sec. 12. Any member of this exchange or firm or corporation in which he may be a partner, violating any of the provisions of this rule, shall be fined not less than $500, nor more than $1,000, for the first offense. If said fine be not paid within three days, said member or firm may be suspended from membership until same is paid. For a second offense, said member or firm may be expelled from membership in the exchange.

"Sec. 13. From such fines and special assessments, the exchange shall pay a reward of $500 to any party or parties furnishing sufficient evidence to convict any member of a violation of any of the provisions of this rule, and said reward shall be paid immediately after conviction.

"Sec. 14. For the purpose of making effective section 12 of this rule, when the treasurer shall not have on hand from fines collected the sum of $500, the directors shall levy a special assessment, pro rata, on each commission firm or corporation buying or selling live stock in this market who is a member of the exchange; and they shall continue to levy such special assessments in such amounts as will keep a fund of $500 constantly on hand for this purpose. Said fund shall be kept as a special fund, and shall be used for no other purpose.

"Sec. 15. Each firm or corporation represented in this exchange shall be held responsible for any violation of this rule by any party doing any portion of a commission business in its name, and any penalty imposed for violation of the foregoing shall be on account of such party. If not paid within three days, the firm or corporation doing said business shall sever its business connections with such party within ten days. No firm or corporation shall thereafter do any business for such party until said fine is paid.

### "Rule XVI. Limitations.

"Section 1. No member of the Kansas City Live-Stock Exchange shall transact any business with any person violating any of the rules or regulations of this exchange, or an expelled or suspended member, after notice of such violation, suspension, or expulsion has been issued by the secretary or board of directors of the exchange."

The bill further charges that the defendants, by the adoption of said articles of association, have confederated and conspired together in violation of the laws of the United States, and particularly of the act of congress approved July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," and to monopolize the business of buying and selling live stock at the Kansas City market, and to illegally fix and establish a minimum price for buying and selling the same, and have further, in restraint of trade and commerce between the states, confederated together to prevent and restrain the free transmission of information regarding the state of the market by telegraphic messages, and have restricted the free employment of agents and solicitors in the prosecution of business at said stock yards; that

the purpose of defendants in organizing said exchange is to prevent the shipment of any live stock to the Kansas City market, unless shipped to the Kansas City Stock Yards, and to defendants or other members of said exchange, and the further purpose was to compel shippers to pay to defendants and their associates the commissions provided for in rule 9, and to prevent the shipment and sale of property on said market unless such commissions were so paid. The bill further charges that it was also the purpose of said defendants and their associates to monopolize the business of receiving, handling, and selling live stock received at said market, and also to prevent its sale by any person not a member of said exchange, and to obstruct and retard the owners of such live stock in the sale of the same on the market at Kansas City. Thereupon the complainant prays for a decree dissolving said exchange, and for an injunction against said defendants, restraining them from enforcing or acting pursuant to the rules and by-laws of said association.

The defendants, for answer to said bill, admit the organization of said defendants into an association known as the "Kansas City Live-Stock Exchange," and aver that similar associations, under the names of "Boards of Trade" or "Exchanges," exist in practically every city of importance in the United States, devoted to the buying and selling of stocks, bonds, grain, live stock, petroleum, and all other products, with similar rules for government and transaction of business, in order that competition between the members may be fair and reasonable; that said methods are sanctioned by the experience of the commercial world, and tend to develop trade and commerce, and not to restrict the same. The preamble of their organization is as follows: "We, the undersigned, for the purpose of organizing and maintaining a business exchange, not for pecuniary profit or gain, nor for the transaction of business, but to promote and protect all interests connected with the buying and selling of live stock at the Kansas City Stock Yards, and to promulgate and enforce amongst the members correct and high moral principles in the transaction of business, have associated, ourselves together, under the name of 'Kansas City Live-Stock Exchange,' and hereby agree each with the other that we will faithfully observe and be bound by the following rules and by-laws, and such new rules, additions, or amendments as may from time to time be adopted in conformity with the provisions thereof, from the date of organization, by the election of a board of directors and other officers, as prescribed by rule 1." The defendants deny that through their membership substantially all of the business of buying and selling live stock at Kansas City is carried on. On the contrary, any person desiring to sell live stock at said city is under no obligation to employ a commission merchant, but is at full liberty to act for himself, and the stock-yards company extends to such person all the privileges and facilities afforded by it; and persons desiring to purchase live stock at the yards may, and they constantly do, purchase direct from the owners and very much the largest part of the cattle purchased for feeding is bought without the employment of any commission merchant. The only restriction upon members of the exchange is that contained in rule 16, viz. that they will not deal with a person as a commission merchant who violates the rules of the exchange, or who is a suspended or expelled member thereof. It is further averred that the Kansas City market is not a public market, but is of a private character merely. Defendants further aver that with the exception of the firm of Greer, Mills & Co., which was first suspended from membership in the exchange for nonpayment of a fine imposed for a violation of the rules thereof, and which subsequently voluntarily withdrew from said exchange, all of the commission merchants at said yards are members of the exchange. Defendants further aver that, whenever drafts are drawn on a commission merchant, they are paid either at the place where payable by the terms thereof, or on presentation to the drawee; and that such place of payment is either in the state of Kansas or Missouri, according as the particular transaction is closed. Defendants are informed by counsel, and believe, that the exercising of their occupation is not commerce between the states, within the meaning of the constitution or laws of the United States; that it is not true that a consignor of live stock is not permitted or cannot sell the same at said yards, or that the members of said exchange refuse to deal with a nonmember thereof. It is not true that any person shipping live stock to said yards, and refusing

to employ a member of said exchange, is compelled to reship the same to some other market. Defendants deny that there is any unlawful combination among them, or that any 'person is prevented from delivering stock to the Kansas City Stock Yards, or that the sale thereof is hindered or delayed, or expense or loss to the shipper entailed, or any obstruction or embargo placed upon the marketing of any live stock. Defendants deny that any of the rules of said association are in restraint of commerce between the states, or otherwise. Defendants deny that they have confederated together, in violation of' the laws of the United States, to monopolize the business of buying and selling live stock at said yards, or to illegally fix a minimum price for buying and 'selling such live stock, or to restrain the free transmission .of information respecting the state of the Kansas City market by telegraphic messages, or restrict the free employment of agents or solicitors in said business; that experience has shown that, to the success of such an organization, it is absolutely essential that there should be a uniform schedule of commissions, and that all members should observe the same; and that, by permitting evasions or violations of such schedule, a condition is created by which irresponsible persons might and would bring about a state of unhealthy cutting of prices,— a practice unfair to shippers and purchasers, and ruinous to responsible persons who carry on the occupation of commission merchants fairly. They have no desire to prevent any person from acting as a commission merchant at Kansas City, but they admit that it is not to the interest of .the public or shippers to employ nonmembers, and that individually and collectively the provisions of their articles of association are invoked for the purpose of preventing the success of any competitor, either in his efforts to destroy said exchange, or to succeed in driving the competitors of such parties from the field.

The act of congress of July 2, 1890 (26 Stat. 209) under which this proceeding is brought, provides as follows:

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. * * *

"Sec. 2. Every person who shall monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor. * * *"

Section 4 gives to circuit courts of the United States jurisdiction.to prevent and restrain violations of the act, and makes it the duty of the district attorney, under directions of the attorney general, to institute proceedings in equity to restrain such violations.

W. C. Perry, U. S. Atty.

Karnes, Holmes & Krauthoff, McGrew, Watson & Watson, and Hutchings & Keplinger, for defendants.

FOSTER, District Judge (after stating the facts). It will be observed that the answer of the defendants denies and puts in issue the allegations of the. bill charging a combination or conspiracy or contract in restraint of trade or commerce, and denies any monopoly or attempt to monopolize or combination to monopolize any part of the trade or commerce among the several states, and denies that the business for which the exchange was organized, and in which its members are engaged, comes under the class of commerce or trade among the states.

The first question, whether there is any combination in restraint of trade or commerce, or a combination to monopolize any part of trade or commerce, on the part of the defendant association, is to be determined, not alone from what appears upon the face of its preamble, rules, and by-laws, but from the entire situation and the prac-

tical working and results of the defendants' methods of doing business, as disclosed by the testimony in the case. The defendant association is located at Kansas City, on the line between Kansas and Missouri, in the immediate vicinity of the Kansas City Stock Yards, and in close association therewith, being tenants of said stock-yards company. Said yards, with, perhaps, the exception of the yards at Chicago, are the largest in the country, and handle great numbers of live stock. These yards, the packing houses, and this exchange are all situated at the gateway through which flows the great stream of commerce of several states and territories, and among all the business tributary to this locality probably none is as important as the live-stock business and the various industries connected therewith. The defendant association is entirely voluntary in form, and does not directly require any person engaging in the live-stock commission business to become a member; but it will be observed that rule 16 prohibits any member from dealing with any person violating any of the rules or regulations of the exchange, or an expelled or suspended member, after notice of such suspension has been issued by the secretary or board of directors. In practice, as amply appears from the testimony of many witnesses, this rule shuts out all dealings and business intercourse between members and nonmembers of the association. It is shown beyond cavil that the entire membership of the association regards a commission merchant attempting to do business at the Kansas City Stock Yards without joining the exchange as one violating this rule, and treat him accordingly. And this construction is a natural one, for a compliance with the rules of the exchange requires a party to subscribe to its rules and by-laws, and to pay a membership fee (which is now $2,500), to pay his assessments, and observe all other requirements, including the fees and commissions fixed for handling live stock; and it may well be said that any dealer or broker does business in violation of these rules who does business at all and fails to join the association. The testimony discloses several instances of parties attempting to enter the field, and do business there, without joining the exchange; and in every instance, unless protected by the courts, they have been compelled to abandon the undertaking. All parties now engaged in the business are members of the exchange, except Greer, Mills & Co., who are making a fight in the courts to maintain their business, and are temporarily protected by injunction. It appears from the testimony that any person or partnership attempting to carry on business independent of the association is invited to apply for membership, and if he fails to do so, or if rejected, and attempts to proceed, his name is written on a blackboard kept for public use in the exchange building, and all members are warned against dealing with him. This admonition is strictly obeyed, and such person is boycotted. The outcome is inevitable. The combined opposition of three hundred men against one can produce but one result. Almost every purchaser or vendor of live stock, including the great packing houses, does business through commission merchants, and nearly the entire volume of live stock received at the yards is consigned to and con-

trolled by these merchants, members of the exchange. In vain does the outside dealer offer attractive bargains for the sale or purchase of stock; they will have no intercourse with him. This state of affairs is known and circulated among stock growers and shippers, and they dare not ship their stock to this boycotted broker or firm. These facts are established and amplified by a multitude of witnesses. The object and purpose of the exchange is written across its face, where all can read. It is to control and monopolize the entire business of buying and selling live stock at the Kansas City Stock Yards. It is clearly a combination to restrict, control, and monopolize that class of trade and commerce. The defendants declare that the rules, regulations, and prices for doing the business are all reasonable and fair and for the best interests of buyer and seller. Possibly that is so, although it is not apparent, looking at the interests of the stock grower or purchaser, why the number of solicitors of business should be limited to three for each firm, or why there should be a restriction on telegraphic information as to the state of the market, or why he should be compelled to pay a commission of 50 cents a head on cattle when he paid 25 cents before the exchange was organized, or why there should be discriminating charges on stock from different localities.

Counsel for defendants have, with commendable zeal and industry, submitted for our consideration the rules of a great number of exchanges and boards of trade throughout the cities of the United States, dealing in corporate stocks, grains, live stock, and various other things, and contend that they are essential, if not indispensable, to the commerce and business interests of the country, and that to grant the prayer of this bill would be the deathblow of those institutions. Courts cannot shut their eyes to the results of their judicial conclusions, but how far such results should control those conclusions depends on several conditions, not necessary to discuss here; nor would it be proper to consider here what effect this act of congress may have on these organizations, or any of them. I may be permitted to say, however, that the methods and aims of many of these exchanges and boards of trade are not altogether beneficial to the business and commerce of the country. That they are beneficial to the members, and perhaps to the locality, may be admitted. It must also be admitted that a properly conducted agency or medium through which the vendor and vendee may readily sell and buy everything that enters into commerce or trade is demanded by the business interests of the whole country; but this agency should not be permitted to tamper with or in any way impede or restrain the natural flow of the stream of industry or commerce. The crying complaint of to-day, and the great menace to the welfare of the people, is the tendency of wealth to monopolize and control, by trusts and combinations, the products and industries of the country; and it must be confessed by every thoughtful observer that many of the so-called stock and produce exchanges are among the most potent instruments for the accomplishment of these purposes by speculators and adventurers. Men who add nothing to the productive wealth of

the country grow rich or poor by gambling on the wealth produced by others. Men are daily selling, through these exchanges, millions of bushels of corn, wheat, and other produce, who neither have nor expect to have a bushel; and others are buying millions, who never expect to receive a bushel. Both sides are tampering with the normal prices fixed by the law of supply and demand, and attempting, by false and dishonest means and methods, to serve their ends. The courts have uniformly condemned this class of business as illegal, and, though it is under the ban of the law, it still flourishes. The remedy must be looked for in legislation, and not in the courts alone.

This act of congress is aimed against all restrictions of interstate commerce, and we need not discuss the reasonableness of such restrictions. It is evidently the purpose of the law to permit commerce between the states to flow in its natural channels, unrestricted by any combinations, contracts, or conspiracies, or monopolies whatsoever. U. S. v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 Sup. Ct. 540; U. S. v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249; Leisy v. Hardin, 135 U. S. 107, 10 Sup. Ct. 681; Walling v. Michigan, 116 U. S. 454, 6 Sup. Ct. 454; Robbins v. Taxing Dist., 120 U. S. 490, 7 Sup. Ct. 592.

But one material question remains in the case: Is the business in which the defendants are engaged commerce between the states? The circumstance that their place of business is located on both sides of the line between the states of Kansas and Missouri is, in my opinion, a fact of no material importance in the solution of this question; no more than would be the fact that the business of a farmer or manufacturer was so located, and that he passed from one state to the other for his convenience in the transaction of his usual business. The method of business of the defendants is as follows: The shipment of live stock from growers, dealers, and traders in Kansas, Colorado, Nebraska, Missouri, Texas, New Mexico, Arizona, Oklahoma, and other states and territories is solicited by the commission merchant in various ways, but largely by the personal solicitation of agents who travel about the country and interview the stock men. Frequently the commission man makes loans of money on the herds, secured by chattel mortgage. The consignment of the stock is made to the commission man or firm at the Kansas City Stock Yards, and there unloaded. Frequently the shipper draws on the consignee through his local bank with the bill of shipment attached; and, when the stock is sold, the loan on the cattle, or the draft on the consignee, as the case may be, is paid out of the proceeds, and the balance remitted to the shipper. While the broker is soliciting consignments of stock for sale, he is also on the alert for purchasers. He sells the stock without regard to its destination. Some is reshipped to other markets in other states, notably to Chicago and St. Louis. Much of it, especially hogs, is slaughtered at the large packing houses near by, in Kansas and Missouri. Is this business, so conducted, interstate commerce, or merely an incident or aid to such commerce?

Commerce among the states has been defined as follows:

"Commerce with foreign countries and among the states, strictly considered, consists in intercourse and traffic, including in these terms navigation and

the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities." County of Mobile v. Kimball, 102 U. S. 691; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 5 Sup. Ct. 826.

In Re Greene, 52 Fed. 113, Judge Jackson says:

"In the application of this comprehensive definition, it is settled by the de-'cisions of the supreme court that such commerce includes, not only the actual transportation of commodities and persons between the states, but also the instrumentalities and processes of such transportation; that it includes all the negotiations and contracts which have for their object, or involve as an element thereof, such transmission or passage from one state to another."

In U. S. v. E. C. Knight Co., 156 U. S. 13, 15 Sup. Ct. 254, Mr. Chief Justice Fuller, speaking for the court, says:

"The regulation of commerce applies to the subjects of commerce, and not to matters of internal police. Contracts to buy, sell, or exchange goods to be transported among the several states, the transportation and its instrumentalities, and articles bought, sold, or exchanged for the purpose of such transit among the states, or put in the way of such transit, may be regulated, but this is because they form part of interstate trade or commerce."

It has been repeatedly held by the supreme court that a person so-liciting orders for goods or freights to be shipped from one state to another, and express agents transporting goods from state to state, are engaged in commerce between the states, and a local tax or license cannot be imposed for transacting such business. Walling v. Michigan, 116 U. S. 446, 6 Sup. Ct. 454; Pickard v. Car Co., 117 U. S. 34, 6 Sup. Ct. 635; Robbins v. Taxing Dist., 120 U. S. 489, 7 Sup. Ct. 592; Asher v. Texas, 128 U. S. 129, 9 Sup. Ct. 1; McCall v. California, 136 U. S. 104, 10 Sup. Ct. 881; Norfolk & W. R. Co. v. Penn-sylvania, 136 U. S. 114, 10 Sup. Ct. 958; Crutcher v. Kentucky, 141 U. S. 47, 11 Sup. Ct. 851; Brennan v. City of Titusville, 153 U. S. 289, 14 Sup. Ct. 829; Minnesota v. Barber, 136 U. S. 313, 10 Sup. Ct. 862. It has also been held that telegraphy between the states is inter-state commerce. Leloup v. Port of Mobile, 127 U. S. 640, 8 Sup. Ct. 1380; Pensacola Tel. Co. v. Western Union Tel. Co., 96 U. S. 1; Tele-graph Co. v. Texas, 105 U. S. 460. The question of what constitutes commerce between the states, and thus protected by the constitution, and that which is merely an incident or aid to such commerce, and exempt from federal control, has been much considered by the fed-eral courts, and sometimes the line of distinction is difficult of dis-cernment. Having a watchful regard for the police powers of the states, and the right of taxation, the federal courts have carefully discriminated in these cases, so that the general government should take nothing to itself not fairly delegated by the constitution. Na-than v. Louisiana, 8 How. 73; Crutcher v. Kentucky, 141 U. S. 47, 11 Sup. Ct. 851; Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468; Kidd v. Pearson, 128 U. S. 1–20, 9 Sup. Ct. 6; U. S. v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249; Munn v. Illinois, 94 U. S. 113; In re Greene, 52 Fed. 113; Henderson v. Mayor. etc., 92 U. S. 259; Cov-ington & C. Bridge Co. v. Kentucky, 154 U. S. 204, 14 Sup. Ct. 1087; Henderson Bridge Co. v. Kentucky, 166 U. S. 150, 17 Sup. Ct. 532.

Perhaps a fair test of the character of defendants' rules and by-laws would be presented by these questions: Could a state, by leg-

islation, impose on this traffic the restrictions and regulations demanded by these rules and by-laws? Could it limit the number of agents a merchant should have soliciting business in other states? Could it restrain telegraphic communication between points in different states? Could it make a discrimination in rates for handling stock shipped from different localities outside of the state? It is indisputable that all the live stock shipped to these defendants for sale from states other than Kansas and Missouri, after it has entered the current of commerce between the states, continues and remains the subject of such commerce until the transportation is terminated, and the property becomes a part of the general property of the state. It is also well settled that, while this property is the subject of interstate commerce, no state, municipality, or other power but congress can impose taxes, restrictions, or regulations upon it, except so far as is proper, in the exercise of police regulations, for the protection of the health, morals, and person of the citizen, and except for proper charges and regulations for the use of local instruments as aids or incidents to such commerce, such as docks, bridges, wharves, elevators, ferries, pilotage, etc., when congress has not acted in the matter.

In the case of Bowman v. Railway Co., 125 U. S., at page 497, 8 Sup. Ct. 704, Mr. Justice Matthews lays down this principle in the following language:

"It is also an established principle, as already indicated, that the only way in which commerce between the states can be legitimately affected by state laws is when, by virtue of its police power and its jurisdiction over persons and property within its limits, a state provides for the security of the lives, limbs, health, and comfort of persons, and the protection of property, or when it does those things which may otherwise incidentally affect commerce,—such as the establishment and regulation of highways, canals, railroads, wharves, ferries, and other commercial facilities; the passage of inspection laws to secure the due quality and measure of products and commodities; the passage of laws to regulate or restrict the sale of articles deemed injurious to the health or morals of the community; the imposition of taxes upon persons residing within the state or belonging to its population, and upon avocations and employments pursued therein, not directly connected with foreign or interstate commerce or with some other employment or business exercised under authority of the constitution and laws of the United States; and the imposition of taxes upon all property within the state, mingled with and forming part of the great mass of property therein. But, in making such internal regulations, a state cannot impose taxes upon persons passing through the state, or coming into it merely for a temporary purpose, especially if connected with interstate or foreign commerce; nor can it impose such taxes upon property imported into the state from abroad, or from another state, and not yet become a part of the common mass of property therein; and no discrimination can be made by any such regulations adversely to the persons or property of other states; and no regulations can be made directly affecting interstate commerce."

Bowman v. Railway Co., 125 U. S. 465, 8 Sup. Ct. 689, 1062; License Cases, 5 How. 504; Passenger Cases, 7 How. 283; Nathan v. Louisiana, 8 How. 73; Freight Tax Case, 15 Wall. 232; Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. 681 (Original Package Case); Henderson v. Mayor, 92 U. S. 259; Kentucky & I. Bridge Co. v. Louisville & N. R. Co., 37 Fed. 567; Guy v. Baltimore, 100 U. S. 434; Railway Co. v. Becker, 32 Fed. 849; Plumley v. Massachusetts, 155

U. S. 461, 15 Sup. Ct. 154; Covington & C. Bridge Co. v. Kentucky, 154 U. S. 204, 14 Sup. Ct. 1087; U. S. v. Addyston Pipe & Steel Co., 78 Fed. 712; Packet Co. v. Keokuk, 95 U. S. 80 (wharfage); Welton v. Missouri, 91 U. S. 275; Walling v. Michigan, 116 U. S. 446, 6 Sup. Ct. 454; Coal Co. v. Bates, 156 U. S. 577, 15 Sup. Ct. 415; In re Rahrer, 140 U. S. 545, 11 Sup. Ct. 865; In re Minor, 69 Fed. 233; Scott v. Donald, 165 U. S. 58, 17 Sup. Ct. 265; Pittsburg & S. Coal Co. v. Louisiana, 156 U. S. 590, 15 Sup. Ct. 459; Hooper v. California, 155 U. S. 648, 15 Sup. Ct. 207; Emert v. Missouri, 156 U. S. 296, 15 Sup. Ct. 367.

Counsel for defendants contend that their business is only an aid or incident to commerce,—something in the nature of personal service; but it is not apparent that a combination for services may not be a restraint or monopoly of commerce, under the act of congress. U. S. v. Trans-Missouri Freight Ass'n, 166 U. S. 312, 17 Sup. Ct. 540. But the business of defendants is more than personal services; it is not merely a local instrumentality in aid of commerce. Defendants are active promoters, and frequently interested parties, in this immense traffic. They reach out over many states and territories by their solicitors and advertisements, and gather in, for sale and slaughter, millions of cattle, sheep, and hogs, and their rules and regulations cover the entire business, and extend over the whole field of operation. Touching the question of what are aids or incidents to commerce, as well as police powers of the states, the following cases are in point: Packet Co. v. St. Louis, 100 U. S. 423; Vicksburg v. Tobin, Id. 430; Packet Co. v. Catlettsburg, 105 U. S. 559; Parkersburg & O. R. Transp. Co. v. City of Parkersburg, 107 U. S. 691, 2 Sup. Ct. 732; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 5 Sup. Ct. 826; Huse v. Glover, 119 U. S. 543, 7 Sup. Ct. 313; Hall v. De Cuir, 95 U. S. 485; Cooley v. Board, 12 How. 298; Packet Co. v. Aiken, 121 U. S. 444, 7 Sup. Ct. 907; Sands v. Improvement Co., 123 U. S. 288, 8 Sup. Ct. 113; Monongahela Nav. Co. v. U. S., 148 U. S. 312, 13 Sup. Ct. 622; St. Louis v. W. U. Tel. Co., 148 U. S. 92, 13 Sup. Ct. 485; Munn v. Illinois, 94 U. S. 113; Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468; New York, L. E. & W. R. Co. v. Pennsylvania, 158 U. S. 431, 15 Sup. Ct. 896; Henderson Bridge Co. v. Kentucky, 166 U. S. 150, 17 Sup. Ct. 532.

The defendants further contend that when this live stock reaches Kansas City, and is unloaded into the stock yards, it ceases to be the subject of interstate commerce. This proposition, however, covers but one point in the controversy, for several of the rules and by-laws of defendants have more than a local operation, and extend beyond state lines. Does this stock, once upon the stream of commerce, cease to be such when unloaded at Kansas City? Could the state of Kansas tax these cattle in the stock yards?

The defendants cite the case of Brown v. Houston, 114 U. S. 623, 5 Sup. Ct. 1091, and Coal Co. v. Bates, 156 U. S. 577, 15 Sup. Ct. 415. In the former case the coal which was subjected to taxation had reached its destination,—i. e. the state of Louisiana,—and was there offered for sale in great or small quantities to suit the purchaser. The court says:

"It might continue in that condition for a year or two years, or for only a day. * * * We do not mean to say that if a tax collector should be stationed at every ferry and railroad depot in the city of New York, charged with the duty of collecting a tax on every wagon load or car load of produce or merchandise brought into the city, that it would not be a regulation of and restraint upon interstate commerce, so far as the tax should be imposed on articles brought from other states. We think it would be, and that it would be an encroachment upon the exclusive power of congress."

Bearing upon this question is the case of Brown v. Maryland, 12 Wheat. 419; also, Leisy v. Hardin, 135 U. S. 108, 10 Sup. Ct. 684. In this case, Mr. Chief Justice Fuller, speaking for the court, says:

"That the point of time when the prohibition ceases, and the power of the state to tax commences, is not the instant when the article enters the country, but when the importer has so acted upon it that it has become incorporated and mixed up with the mass of property in the country, which happens when the original package is no longer such in his hands; that the distinction is obvious between a tax which intercepts the import as an import on its way to become incorporated with the general mass of property, and a tax which finds the article already incorporated with that mass by the act of the importer."

This live stock is shipped from different states for immediate sale, and, if the market at Kansas City is not satisfactory, it is to be shipped to another market. I cannot believe it ceases to be the subject of interstate commerce when unloaded into the stock yards. Sections 4386 and 4387 of the Revised Statutes humanely prohibit any railroad company whose road forms any part of a line over which animals are conveyed from one state to another from confining them in cars over 28 consecutive hours without unloading them for rest, water, and food for at least 5 consecutive hours. Under the act of congress of May 29, 1884, establishing a "Bureau of Animal Industry," and the act of March 3, 1891, for the inspection of live cattle, hogs, etc., the general government has established inspectors at the Kansas City Stock Yards, assuming that such stock comes within the purview of said acts of congress. While realizing the importance of the issue involved in this case, and the responsibility of making application of the "Anti-Trust Act" to a new order of facts, I am impelled to the conclusion that, under the facts and the law applicable thereto, the prayer of this bill should be granted.