# BRENNAN *v.* TITUSVILLE.

ERROR TO THE SUPREME COURT OF THE STATE OF PENNSYLVANIA.

No. 902. Submitted January 5, 1894. — Decided April 30, 1894.

An ordinance requiring agents soliciting orders on behalf of manufacturers of goods to take out a license and pay a tax therefor, made by a municipal corporation under authority conferred by a statute of the State, granting to such corporations power to levy and collect license taxes on hawkers, peddlers and merchants of all kinds, is an exercise, not of the police power, but of the taxing power; and when it is enforced against an agent, sent by a manufacturer of goods in another State to solicit orders for the products of his manufactory, it imposes a tax upon interstate commerce, in violation of the provisions of the Constitution of the United States.

This court is not bound by the decision of the highest court of the State in which such a tax is authorized and imposed, that its authorization and imposition are an exercise of the police power, and not of the taxing power.

On May 12, 1890, plaintiff in error was convicted in the court of the city recorder of the city of Titusville, Pennsylvania, of a violation of an ordinance, entitled " An ordinance to provide for the levy and collection for general revenue purposes of annual license taxes in the city of Titusville," and sentenced to pay a fine of $25 and costs. From that sentence he appealed to the Court of Common Pleas of Crawford County. In that court the case was tried upon the following agreed statement of facts:

" 1. J. A. Shephard is a manufacturer of picture frames and maker of portraits, residing in Chicago, in the State of Illinois, of which State he is a citizen and in which city he has his manufactory and place of business.

" 2. In the prosecution of said business he employs agents who, under his direction, solicit orders for pictures and picture frames in the State of Pennsylvania and in other States of the Union, by going personally to residents and citizens of said State of Pennsylvania and other States and exhibiting samples of his pictures and frames, going, when necessary, from house to house in said State of Pennsylvania and other States.

" 3. The defendant, J. W. Brennan, was an agent of the said J. A. Shephard, employed by him to travel and solicit orders for said pictures and frames in the manner stated, upon a salary and also upon commission upon the amount of his sales, at the time of his arrest, May 25, 1889, upon a warrant issued by the authorities of the city of Titusville, in the State of Pennsylvania.

" 4. Upon receiving orders for pictures and picture frames, the agents of the said J. A. Shephard forwarded the same to him at Chicago, in the State of Illinois, where the goods were made, and from there shipped by said J. A. Shephard to the purchasers in Titusville, in the State of Pennsylvania, by railroad freight and express, and the price of said goods was collected and forwarded by the express companies and sometimes by the agents to said Shephard, at Chicago, in the State of Illinois. J. W. Brennan, the agent employed by J. A. Shephard, was engaged in conducting the business in the manner stated at the time of his arrest, May 25, 1889. The said J. W. Brennan, at the time of his arrest and before, had not been otherwise employed than as stated, and was acting solely for the said Shephard.

" 5. The city of Titusville had enacted an ordinance, in force at the date of the arrest of said J. W. Brennan, which in the twelfth section thereof provides in words and figures as follows:

" ' That all persons canvassing or soliciting within said city orders for goods, books, paintings, wares, or merchandise of any kind, or persons delivering such articles under orders so obtained or solicited, shall be required to procure from the mayor a license to transact said business, and shall pay to the said treasurer therefor the following sums, according to

the time for which said license shall be granted, viz.: For one day, one dollar and fifty cents; one week, $5.00; three months, $10.00; one year, twenty-five dollars; provided, that the provisions of this ordinance shall not apply to persons selling by sample to manufacturers or licensed merchants or dealers residing and doing business in said city.'

"And the said ordinance further provides, in the 18th section thereof, as follows:

"'That any person or persons failing to obtain a license as required by this ordinance shall, upon conviction thereof before any magistrate, alderman, or justice of the peace of said city, forfeit and pay a fine not exceeding one hundred dollars, nor less than the amount required for a license to such person or persons, together with twenty per cent added as a penalty, with costs of suit; and in default of payment thereof shall undergo a confinement in the city or county prison for a period not exceeding ninety days, or perform hard labor on the streets or elsewhere in said city not exceeding such period.'

"6. At the time of his arrest the defendant Brennan was not and had not been selling by sample to manufacturers or licensed merchants or dealers residing in said city of Titusville, and was not, within the provision of the 12th section of said ordinance, soliciting to such excepted persons.

"7. The defendant, J. W. Brennan, at the time of his arrest had not obtained a license as required by said ordinance, and had not paid to the treasurer of the city of Titusville the license fee provided by said ordinance.

"8. The defendant was arrested, tried, convicted and sentenced to pay a fine of $25 and costs of suit under said ordinance, on the 29th day of May, 1889, before W. M. Dame, city recorder of the city of Titusville.

"If the court should be of opinion upon the facts stated that the defendant, J. W. Brennan, was liable to take out a license and pay the license fee provided by said ordinance, then judgment to be entered for the plaintiff, the city of Titusville, for $25 and costs of suit. If the court should be of opinion that said Brennan was not so liable, then judgment to be entered for the defendant, with costs of suit."

Upon these facts, on May 20, that court entered judgment against him for $25 and costs. From that judgment he appealed to the Supreme Court of the State; which court, on October 5, 1891, affirmed the judgment. *Titusville* v. *Brennan*, 143 Penn. St. 642. Thereupon he sued out a writ of error from this court.

*Mr. Roger Sherman* for plaintiff in error.

*Mr. George A. Chase* for defendant in error.

The reserve police power of the States — not granted to the Federal government — has been the ground for the enactment of a great variety of state acts, regulating widely different subjects, from the manufacture of oleomargarine in Pennsylvania, or the brewing of beer in Kansas, or the practice of medicine in Washington, to the washing of clothes in New Hampshire, and, as has been remarked by an eminent judge, "the scope of this power has been the subject of much controversy, and the term has been variously defined by the courts and text writers." In *Beer Company* v. *Massachusetts*, 97 U. S. 25, 32, 33, Bradley, J., in delivering the opinion of the court says: " All rights are held subject to the police power of the State." " Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizens, and to the preservation of good order and the public morals. The legislature cannot, by any contract, divest itself of the power to provide for these objects. They belong emphatically to that class of objects which demand the application of the maxim, *salus populi suprema lex*." To the same effect in *Barbier* v. *Connolly*, 113 U. S. 27, 31, Field, J., says, after stating the true scope of the Fourteenth Amendment, "But neither the amendment — broad and comprehensive as it is — nor any other amendment, was designed to interfere with the power of the State, sometimes termed its 'police power,' to

prescribe regulations to promote the health, peace, morals, education and good order of the people, and to legislate so as to increase the industries of the State, develop its resources and add to its wealth and prosperity."

In *Hayes* v. *Missouri*, 120 U. S. 68, 71, "the Fourteenth Amendment," says Field, J., "to the Constitution of the United States does not prohibit legislation which is limited either in the objects to which it is directed, or by the territory within which it is to operate. It merely requires that all persons subjected to such legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the localities imposed."

In *Powell* v. *Pennsylvania*, 127 U. S. 678, the court says, that the oleomargarine act does not deny to any person the equal protection of the laws, because it places under the same restrictions all who manufacture or sell the articles embraced within its prohibition, thus recognizing and preserving the principles of equality among those engaged in the same business.

In *Munn* v. *Illinois*, 94 U. S. 113, the court declares that a State can require all persons whose business is affected with a public interest (in this instance the storage of grain in elevators) to charge only such rates as shall be reasonable, and can even go farther and declare what rates shall be reasonable. See also the *Granger Cases*, (reported in same volume,) in which above doctrine was applied to the business of a common carrier.

In *Pullman Car Co.* v. *Pennsylvania*, 141 U. S. 18, the court held that a State may tax the cars of a foreign sleeping car company, employed in interstate commerce, which run into, through, and out of such State, and declared that an act imposing such a tax is a valid and constitutional law.

That there is still much uncertainty with respect to the authority of the States over commerce not wholly internal, particularly in respect to the police power, and their power to tax the subjects of interstate commerce is evidenced by the recent decisions of this court in several important cases which qualify the principles laid down by it in prior cases upon

which plaintiff in error relies. Thus, in *Maine* v. *Grand Trunk Railway Co.*, 142 U. S. 217, it was held that a state statute requiring every railroad within the State to pay an annual tax for its *franchise*, to be determined by the amount of its gross transportation receipts, and further providing that, when applied to a railroad lying partly within and partly without the State, the tax shall be equal to the proportion of the gross receipts in the State, did not conflict with the Constitution of the United States. In this case Mr. Justice Bradley made his last public utterance from the bench in a strong dissent, concurred in by three other justices, taking the position that the laying of a tax upon the gross receipts of a company, including receipts for interstate and international transportation, was substantially a taxation of the revenues derived from interstate commerce, which had been held in many previous decisions to be unconstitutional, citing *Philadelphia Steamship Co.* v. *Pennsylvania*, 122 U. S. 326, and several other cases. The majority of the court, however, was of the opinion that this was an *excise tax* upon the corporation for the privilege of *exercising its franchises* within the State, and that the rule of apportioning the charge to the receipts was reasonable, and likely to produce the most satisfactory results, both to the State and the corporation taxed.

In *Horn Silver Mining Co.* v. *New York*, 143 U. S. 305, it was held, Mr. Justice Harlan alone dissenting, that a statute of New York imposing a tax upon the corporate franchise or business of every corporation, organized under a law of any other State, to be computed by a percentage upon its whole capital stock, was not an unconstitutional interference with interstate commerce, when applied to a manufacturing corporation organized under the laws of Utah, and doing a greater part of its business out of the State of New York, but doing a small part of its business within such State.

The principle involved in the case of *Munn* v. *Illinois*, which has given rise to so much controversy, was carefully reconsidered and adhered to in the case of *Budd* v. *New York*, 143 U. S. 517, although in this case, as in the *Munn case*, there was a dissent by three of the justices.

In *Ficklen* v. *Shelby County Taxing District*, 145 U. S. 1, a statute of Tennessee, imposing upon brokers a tax measured by the amount of capital invested or used in their business, was held to be proper, although the business done by the broker in question was the purchase of cotton for customers, residing outside of the State. The gist of the decision was, that as the State has the right to tax occupations, where a resident citizen engaged in such business, the fact that the business done, consisted wholly or partly in negotiating sales between resident and non-resident merchants, did not necessarily make the tax one upon interstate commerce.

In the case at bar, there is nothing in the record to show the plaintiff in error was not a citizen and resident of Pennsylvania; the presumption, therefore, is that he was a citizen and resident of Pennsylvania. Therefore, in the light of the recent decisions of this court, we contend that the fine and penalty imposed on the plaintiff in error by the recorder was not a taxing of goods of Shepard & Co., coming from another State as such, or by reason of their so coming, but a license or excise tax upon the vocation of Brennan, as a resident of Pennsylvania, and a restriction upon the manner of selling said goods — a police regulation of an occupation carried on in a manner offensive to the policy of the State, and an excise tax that did not discriminate in favor of residents or against non-residents. The fee required to be paid by the ordinance under which this suit originated is not a tax, in the common acceptance of that term, but a license fee. It is not a tax upon either the business or property of Shephard & Co., but a condition precedent before the plaintiff in error, Brennan, shall pursue the occupation or vocation of a canvasser, hawker, peddler or agent.

If it be a license fee or license tax, it cannot be a regulation of commerce. *License Tax Cases*, 5 Wall. 462, 471; *Osborne* v. *Mobile*, 16 Wall. 479; *Ward* v. *Maryland*, 12 Wall. 418.

It is competent for the legislature to grant a city or town power to require the payment of money as the condition of exercising particular employments. This is not in the nature of a tax, which must be general, but of an excise on special vocations.

It is the manner in which the employment is exercised that is the subject of this police power and regulation, which is a common law power incident to all municipal corporations.

The ordinance in question does not interfere with the privilege of drummers carrying on business in the city of Titusville, with licensed merchants or dealers. Its provisions are directed only against the "intrusive domiciliary visitation" of canvassers, peddlers, who go from house to house "in relentless pursuit of a purchaser, pressing his wares on the attention of those who neither need nor wish for them," and who from inexperience or ignorance are liable to be imposed upon and defrauded by vagrant persons, who under pretence of being canvassers and peddlers, are frequently nothing but advance couriers of burglaries and other felonies and misdemeanors.

In *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, the court evidently had in mind in rendering its opinion, the transaction of business between experienced licensed merchants and drummers. Bradley, J., in delivering the opinion in that case, concedes that commerce between States can be legitimately affected by state laws, when by virtue of its police power, and its jurisdiction over persons and property within its limits, a State provides for the security of the lives, limbs, health, and comfort of persons and the protection of property.

What can be more annoying to the people or more destructive of their comfort and happiness, than the "intrusive domiciliary visitations" of itinerant peddlers and canvassers, whose name is legion and who assail the privacy of domestic life and have mostly to deal with innocent and unsuspecting women and children, defrauding them of money and property and then fleeing to other States, leaving their victims without redress? Can it, with reason, be said that the enactment of a law or ordinance which has in view the restriction of such practices is not a legitimate exercise of the police power of a State or city, even though it may indirectly affect interstate commerce?

In the able dissenting opinion of Chief Justice Waite (with whom Mr. Justice Field and Mr. Justice Gray concurred) in *Robbins* v. *Shelby Taxing District, supra*, he says, p. 501, " I

am unable to see any difference in principle between a tax on a seller by sample and a tax on a peddler, and yet I hardly believe it would be contended that the provisions of the same statute, now in question, which fixes a license fee for all peddlers in the district, would be held to be unconstitutional in its application to peddlers who come with their goods from another State and expected to go back again. As the law is valid so far as the inhabitants of the State are concerned, no inhabitant can engage in this business unless he pays the tax. If citizens of other States cannot be taxed in the same way for the same business, there will be discrimination against the inhabitants of Tennessee, and in favor of those of other States. This could never have been intended by the legislature, and I cannot believe the Constitution of the United States makes such a thing necessary. The Constitution gives the citizens of each State all the privileges and immunities of citizens in the several States, but this certainly does not guarantee to those who are doing business in States other than their own, immunities from taxation on that business to which citizens of the State where the business is carried on are subjected."

To hold that the citizens of a State should be subject to its police power and regulations, but that canvassers, hawkers, and peddlers coming from other States and infesting the homes of its citizens at all seasons and imposing their worthless goods upon gullible or inexperienced housemaids or housewives, should, under the guise of interstate commerce, be permitted without any restraint whatever to go on deceiving and injuring the public, would be, to use the language of Mr. Justice Williams, " a startling and unlooked-for result of the investment of the general government with the power to regulate commerce."

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The question in this case is whether a manufacturer of goods, which are unquestionably legitimate subjects of commerce, who carries on his business of manufacturing in one

State can send an agent into another State to solicit orders for the products of his manufactory without paying to the latter State a tax for the privilege of thus trying to sell his goods.

It is true, in the present case, the tax is imposed only for selling to persons other than manufacturers and licensed merchants; but if the State can tax for the privilege of selling to one class, it can for selling to another, or to all. In either case it is a restriction on the right to sell, and a burden on lawful commerce between the citizens of two States. It is as much a burden upon commerce to tax for the privilege of selling to a minister as it is for that of selling to a merchant. It is true, also, that the tax imposed is for selling in a particular manner, but a regulation as to the manner of sale, whether by sample or not, whether by exhibiting samples at a store or at a dwelling-house, is surely a regulation of commerce. It must be borne in mind that the goods which the defendant was engaged in selling, to wit, pictures and picture frames, are open to no condemnation, and are unchallenged subjects of commerce. There is no charge of dealing in obscene or indecent pictures, or that the pictures, or the frames, were in any manner dangerous to the health, morals, or general welfare of the community. It must also be borne in mind that the ordinance is not one designed to protect from imposition and wrong either minors, habitual drunkards, or persons under any other affliction or disability. There is no discrimination except between manufacturers and licensed merchants on the one hand, and the rest of the community on the other, and unless it be a matter of just police regulation to tax for the privilege of selling to manufacturers and merchants, it cannot be to tax for the privilege of selling to the rest of the community. The same observation may also be made in respect to the places and manner in which the sales were charged to have been made. It is as much within the scope of the police power to restrain parties from going to a store or manufactory as from going to a dwelling-house for the purposes of making a sale. We do not mean to say that none of these matters to which we have referred are

within the reach of the police power; but simply that the conditions on the one side are no more within its reach than those on the other, so that if, under the excuse of an exercise of the police power, this ordinance can be sustained, and sales in the manner therein named be restricted, by an equally legitimate exercise of that power almost any sale could be prevented.

But again, this license does not purport to be exacted in the exercise of the police, but rather of the taxing power. The statute under which the ordinance in question was passed is found in Laws of Pennsylvania, 1874, pages 230 to 271. Clause 4 of section 20, page 239, grants authority " to levy and collect license taxes on . . . hawkers, peddlers, . . . merchants of all kinds, . . . and regulate the same by ordinance."

The ordinance itself is entitled " An ordinance to provide for the levy and collection for general revenue purposes of annual license taxes in the city of Titusville," and the special section requires a license for transacting business, the license being graded in amount by the time for which it is obtained. This license, therefore, the failure to take out which is the offence complained of, and for which defendant was sentenced, is a license for "general revenue purposes" within the very declarations of the ordinance. Even if those declarations had been the reverse, and the license in terms been declared to be exacted as a police regulation, that would not conclude this question, for whatever may be the reason given to justify, or the power invoked to sustain the act of the State, if that act is one which trenches directly upon that which is within the exclusive jurisdiction of the national government, it cannot be sustained. Thus, in *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 661, this court, by Mr. Justice Harlan, said :

" Definitions of the police power must, however, be taken, subject to the condition that the State cannot, in its exercise, for any purpose whatever, encroach upon the powers of the general government, or rights granted or secured by the supreme law of the land.

" Illustrations of interference with the rightful authority of the general government by state legislation which was de-

fended upon the ground that it was enacted under the police power, are found in cases where enactments concerning the introduction of foreign paupers, convicts, and diseased persons, were held to be unconstitutional, as conflicting, by their necessary operation and effect, with the paramount authority of Congress to regulate commerce with foreign nations, and among the several States. In *Henderson &c.* v. *Mayor of New York*, 92 U. S. 259, the court, speaking by Mr. Justice Miller, while declining to decide whether in the absence of action by Congress, the States can, or how far they may, by appropriate legislation protect themselves against actual paupers, vagrants, criminals, and diseased persons, arriving from foreign countries, said, that no definition of the police power, and 'no urgency for its use can authorize a State to exercise it in regard to a subject matter which has been confided exclusively to the discretion of Congress by the Constitution.' p. 271. *Chy Lung* v. *Freeman*, 92 U. S. 275. And in *Railroad Co.* v. *Husen*, 95 U. S. 465, Mr. Justice Strong, delivering the opinion of the court, said that 'the police power of a State cannot obstruct foreign commerce or interstate commerce beyond the necessity for its exercise; and, under color of it, objects not within its scope cannot be secured at the expense of the protection afforded by the Federal Constitution.' pp. 473, 474."

In *Walling* v. *Michigan*, 116 U. S. 446, 460, in the opinion delivered by Mr. Justice Bradley, it was said: "The police power cannot be set up to control the inhibitions of the Federal Constitution, or the powers of the United States government created thereby."

In *Leisy* v. *Hardin*, 135 U. S. 100, 108, Mr. Chief Justice Fuller commenced the opinion of the court with this general statement of the law applicable to questions of this kind:

"The power vested in Congress 'to regulate commerce with foreign nations, and among the several States, and with the Indian tribes,' is the power to prescribe the rule by which that commerce is to be governed, and is a power complete in itself, acknowledging no limitations other than those prescribed in the Constitution. It is coextensive with the subject on which it acts and cannot be stopped at the external boun-

dary of a State, but must enter its interior and must be capable of authorizing the disposition of those articles which it introduces, so that they may become mingled with the common mass of property within the territory entered. *Gibbons* v. *Ogden*, 9 Wheat. 1; *Brown* v. *Maryland*, 12 Wheat. 419.

" And while, by virtue of its jurisdiction over persons and property within its limits, a State may provide for the security of the lives, limbs, health, and comfort of persons and the protection of property so situated, yet a subject matter which has been confided exclusively to Congress by the Constitution is not within the jurisdiction of the police power of the State, unless placed there by Congressional action."

And, in the still later case of *Crutcher* v. *Kentucky*, 141 U. S. 47, 59, Mr. Justice Bradley referred to the matter in these words:

" But the main argument in support of the decision of the Court of Appeals is that the act in question is essentially a regulation made in the fair exercise of the police power of the State. But it does not follow that everything which the legislature of a State may deem essential for the good order of society and the well-being of its citizens can be set up against the exclusive power of Congress to regulate the operations of foreign and interstate commerce."

So in the case of *Minnesota* v. *Barber*, 136 U. S. 313, in which a law of the State of Minnesota, ostensibly a law for inspection of meats, was declared unconstitutional, the court distinguished in the opinion by Mr. Justice Harlan between that which is mere inspection and in the legitimate exercise of the police power, and that which, under the guise of inspection, is a direct burden upon and obstruction to interstate commerce. Very similar to this was the case of *Brimmer* v. *Rebman*, 138 U. S. 78, in which also an inspection statute of the State of Virginia was set aside for the same reason.

Because a license may be required in the exercise of the police power, it does not follow that every license rests for its validity upon such police power. A State may legitimately make a license for the privilege of doing a business one means of taxation, and that such was the purpose of this ordinance is

obvious, not merely from the fact that in the title it is declared to be for " general revenue purposes," but also from the further fact that, so far as we are informed by any quotations from or references to any part of the ordinance, there is no provision for any supervision, control, or regulation of any business for which by the ordinance a license is required. In other words, so far as this record discloses, this ordinance sought simply to make the various classes of business named therein pay a certain tax for the general revenue of the city.

Even if it be that we are concluded by the opinion of the Supreme Court of the State that this ordinance was enacted in the exercise of the police power, we are still confronted with the difficult question as to how far an act held to be a police regulation, but which in fact affects interstate commerce, can be sustained. It is undoubtedly true that there are many police regulations which do affect interstate commerce, but which have been and will be sustained as clearly within the power of the State ; but we think it must be considered, in view of a long line of decisions, that it is settled that nothing which is a direct burden upon interstate commerce can be imposed by the State without the assent of Congress, and that the silence of Congress in respect to any matter of interstate commerce is equivalent to a declaration on its part that it should be absolutely free.

That this license tax is a direct burden on interstate commerce is not open to question. In the early and leading case of *Brown* v. *Maryland*, 12 Wheat. 419, 444, in which a state law requiring an importer to take out a license and pay $50 before he should be permitted to sell a package of imported goods, was adjudged in conflict with the commerce clause in the national Constitution, Chief Justice Marshall said :

" But should it be proved that a duty on the article itself would be repugnant to the Constitution, it is still argued that this is not a tax upon the article, but on the person. The State, it is said, may tax occupations, and this is nothing more.

" It is impossible to conceal from ourselves that this is varying the form without varying the substance. It is treating a prohibition which is general, as if it were confined to a partic-

-ular mode of doing the forbidden thing. All must perceive that a tax on the sale of an article, imported only for sale, is a tax on the article itself. . . . So a tax on the occupation of an importer is, in like manner, a tax on importation. It must add to the price of the article, and be paid by the consumer, or by the importer himself, in like manner as a direct duty on the article itself would be made." ·

In *Welton* v. *Missouri*, 91 U. S. 275, 278, Mr. Justice Field said:

"Where the business or occupation consists in the sale of goods, the license tax required for its pursuit is in effect a tax upon the goods themselves."

In *Leloup* v. *Mobile*, 127 U. S. 640, 645, are these words from Mr. Justice Bradley:

"Of course, the exaction of a license tax as a condition of doing any particular business, is a tax on the occupation; and a tax on the occupation of doing a business is surely a tax on the business."

It is clear, therefore, that this license tax is not a mere police regulation, simply inconveniencing one engaged in interstate commerce, and so only indirectly affecting the business, but is a direct charge and burden upon that business; and if a State may lawfully exact it, it may increase the amount of the exaction until all interstate commerce in this mode ceases to be possible. And notwithstanding the fact that the regulation of interstate commerce is committed by the Constitution to the United States, the State is enabled to say that it shall not be carried on in this way, and to that extent to regulate it.

These questions of interference by state regulations with interstate commerce have been frequently before this court, and it may not be unwise to examine a few of them. *Welton* v. *State of Missouri*, 91 U. S. 275, presented these facts: Welton was indicted and convicted for acting as a peddler under a statute defining a peddler to be one "going from place to place to sell" goods not the growth, produce, or manufacture of the State, and prohibiting any one from peddling without a license. The conviction was set aside by this court.

It is true that the case turned largely upon the fact of discrimination between products of other States and those of Missouri, but nevertheless the decision is an adjudication that the imposition of a license tax on the peddling of goods is a regulation of commerce.

*Robbins* v. *Shelby Taxing District*, 120 U. S. 489, was a case closely in point. Robbins was engaged in soliciting in the city of Memphis, Tenn., the sales of goods for a Cincinnati firm, exhibiting samples for the purpose of effecting such sales, his employment being that which is usually denominated that of a drummer. This business was declared by a statute of Tennessee to be a privilege for which a license tax was required. Robbins was convicted of a violation of that statute. The statute made no discrimination between those who represented business houses out of the State and those representing like houses within the State. There was, therefore, no element of discrimination in the case, but, nevertheless, the conviction was set aside by this court on the ground that whatever the State might see fit to enact with reference to a license tax upon those who acted as drummers for houses within the State, it could not impose upon those who acted as drummers for business houses outside of the State (and who were, therefore, engaged in interstate commerce) any burden by way of a license tax. The opinion by Mr. Justice Bradley is elaborate and enters fully into a discussion of the question, citing many authorities. It affirms in the strongest language the exclusive power of Congress over interstate commerce; that its failure to make express regulations indicates its will that the subject shall be left free from any restrictions or impositions, and that whatever may be the extent to which the police power of the State can go, it cannot go so far as to uphold any regulations directly affecting interstate commerce.

In the case of *Leloup* v. *Mobile*, 127 U. S. 640, a license tax sought to be imposed by the State upon a telegraph company engaged in interstate commerce, was declared beyond the powers of the State.

*Asher* v. *Texas*, 128 U. S. 129. In that case, a statute requiring from " every commercial traveller, drummer, salesman,

or solicitor of trade, by sample or otherwise, an annual occupation tax of $35 " was declared inoperative so far as it affected one soliciting orders for a business house in another State, and the case of *Robbins* v. *Shelby Taxing District* was expressly reaffirmed.

The same doctrine was applied in *Stoutenburgh* v. *Hennick,* 129 U. S. 141, to the case of an agent of a Maryland business house soliciting orders in the District of Columbia without having taken out a license there, as required by an act of the legislative assembly of the District of Columbia.

In *Lyng* v. *Michigan,* 135 U. S. 161, 166, it was said: " We have repeatedly held that no State has the right to lay a tax on interstate commerce in any form, whether by way of duties laid on the transportation of the subjects of that commerce, or on the receipts derived from that transportation, or on the occupation or business of carrying it on, for the reason that such taxation is a burden on that commerce, and amounts to a regulation of it, which belongs solely to Congress."

In *McCall* v. *California,* 136 U. S. 104, 111, it appeared that McCall was an agent in San Francisco, California, engaged in soliciting business for an Eastern railroad corporation, but not engaged in selling tickets for that company, or receiving, or paying out money on its account, yet it was held that he was engaged in interstate commerce, and the license tax imposed upon him for the privilege of doing such business was unconstitutional. Mr. Justice Lamar, reviewing the prior cases and replying to the objection that this only indirectly affected the commerce of the road, said: " The test is — Was this business a part of the commerce of the road? Did it assist, or was it carried on with the purpose to assist, in increasing the amount of passenger traffic on the road? If it did, the power to tax it involves the lessening of the commerce of the road to an extent commensurate with the amount of business done by the agent."

In *Crutcher* v. *Kentucky,* 141 U. S. 47, 61, an act of the State of Kentucky which forbade the agent of an express company, not incorporated by the laws of that State, from carrying on business without first obtaining a license from the

State, and, as preliminary thereto, that he should satisfy the auditor of the State that the company he represented was possessed of an actual capital of at least $150,000, was held to be a regulation of commerce and invalid. Mr. Justice Bradley, speaking for the court, observed: "The character of police regulation, claimed for the requirements of the statute in question, is certainly not such as to give them a controlling force over the regulations of interstate commerce which may have been expressly or impliedly adopted by Congress, or such as to exempt them from nullity when repugnant to the exclusive power given to Congress in relation to that commerce. This is abundantly shown by the decisions to which we have already referred, which are clear to the effect that neither licenses nor indirect taxation of any kind, nor any system of state regulation, can be imposed upon interstate any more than upon foreign commerce; and that all acts of legislation producing any such result are, to that extent, unconstitutional and void."

Within the reasoning of these cases it must be held that the license tax imposed upon the defendant was a direct burden on interstate commerce, and was, therefore, beyond the power of the State.

The case of *Ficklen* v. *Shelby County*, 145 U. S. 1, is no departure from the rule of decision so firmly established by the prior cases. At least, no departure was intended, though as shown by the division in the court, and by the dissenting opinion of Mr. Justice Harlan, the case was near the boundary line of the State's power. In that case the plaintiffs were in a general commission business, not acting for any particular firm within or without the State. Of the power of a State to impose a license tax upon such a general business there can be no question. The license required by the statute was $50 per annum, plus .10 on every $100 of capital invested, or, if no capital was invested, $2\frac{1}{2}$ per cent on the gross yearly commissions; and at the time of taking out the license the licensees were required to give bond to make return and pay such $2\frac{1}{2}$ per cent at the end of the year. The plaintiffs, for the year 1887, paid each the sum of $50, and having no capital, exe-

cuted bonds for the return and payment of the 2½ per cent. At the end of the year 1887 they failed to make such return and payment, and the authorities refused to issue new licenses for the succeeding year until that was done. Plaintiffs' contention was that, as to one of them, all, and as to the others, most, of their commissions were received on sales of goods forwarded by non-resident parties. On that ground they refused to perform the stipulations of their bonds. It was held that the tax was an entirety, and was not affected by the variable and adventitious results of business from year to year. It could hardly be contended that if the license tax exacted in advance for the privilege of engaging in such business was a fixed sum, a party paying the tax could, on a failure to secure and do any business, recover the tax so paid, for the tax is not for the business done, but for the privilege of engaging in business. So, when the plaintiffs in that case applied for their licenses at the beginning of the year, they assumed the whole liability imposed by the State. That all of it was not paid at once did not affect the measure of liability. Suppose the tax, a fixed sum, had been payable one-half at the commencement and the other half at the close of the year, would it be thought that, having paid the first half at the commencement of the year, they could resist payment of the second half on the ground that half of their commissions were received on goods shipped from outside the State? In other words, the tax imposed was for the privilege of doing a general commission business within the State, and whatever were the results pecuniarily to the licensees, or the manner in which they carried on business, the fact remained unchanged that the State had, for a stipulated price, granted them this privilege. It was thought by a majority of the court that to release them from the obligations of their bonds on account of the accidental results of the year's business was refining too much, and that the plaintiffs who had sought the privilege of engaging in a general business should be bound by the contracts which they had made with the State therefor. In the opinion in that case, by the Chief Justice, the authorities which are referred to in this opinion were cited, and the general rule was

announced as is here stated.   We only refer thus at length to that case to show the distinction between it and this case, and to notice that in the opinion was reaffirmed the proposition that "no State can levy a tax on interstate commerce in any form, whether by way of duties laid on the transportation of the subjects of that commerce, or on the receipts derived from that transportation, or on the occupation or business of carrying it on."

For these reasons the judgment of the Supreme Court of the State of Pennsylvania is

*Reversed and the case remanded for further proceedings in conformity with this opinion.*