STATE OF IOWA, Appellant, v. J. B. ECKENRODE, Appellee.

Interstate commerce: WHAT LAW GOVERNS. The determination of whether a transaction constitutes interstate commerce so as to take it out of the control of a state law involves a construction of the federal Constitution and statutes, and state courts are bound thereby, and by the construction placed thereon by the United States Court.

Same: ORIGINAL PACKAGES: MISBRANDED ARTICLES: PURE FOOD STATUTE: ENFORCEMENT. Congress has provided regulations relating to the sale of original packages of misbranded articles imported from one state to another: So that where, as in this case, a company ships from another state to an agent in this state only such goods as are ordered by purchasers, placing several packages in a box, and the agent receives and opens the box, delivers the packages to customers according to their previous orders, the same being delivered in the form the company received them from the manufacturer, the transaction as a whole constitutes interstate commerce and is not subject to the pure food law of this state relating to misbranded packages; and the agent in delivering the packages to customers is not liable for a violation of the pure food law of this state.

*Appeal from Johnson District Court.*—HON. R. P. HOWELL, Judge.

FRIDAY, JULY 8, 1910.

DEFENDANT was accused of a violation of what is known as the state pure food law. Upon trial in the district court he was acquitted, and the state appeals.— *Affirmed.*

*H. W. Byers,* Attorney-General,. and *Chas. W. Lyon,* Assistant Attorney-General, for the State.

*Wade, Dutcher & Davis,* and *Philemon S. Karshner,* for appellee.

DEEMER, C. J.—The case was tried on an agreed statement of facts and the only questions argued by counsel are whether or not, on the agreed facts, defendant was engaged in interstate commerce. The Attorney-General concedes that if he was so engaged the judgment is correct, and should be sustained. In view of this concession we are relieved of the necessity of determining whether or not the state, in the exercise of its police power, may not prohibit the sale of misbranded goods, although they may be the subject of interstate commerce and be sold in unbroken packages. The concession is bottomed in part upon the fact that Congress has acted upon the same subject and attempted to control this matter in so far as it relates to interstate shipments. See chapter 3915, Act June 30, 1906 (59th Cong.) 34 Stat. 768 (U. S. Comp. St. Supp. 1909, p. 1187).

The latter act, so far as material, reads as follows:

Sec. 2. . . . Any person . . . who shall receive in any state or territory or District of Columbia, from any state or territory or the District of Columbia or foreign country and having so received shall deliver in original unbroken packages for pay or otherwise, or offer to deliver to any person any such article so adulterated or

misbranded within the meaning of this act . . . shall
be guilty of a misdemeanor. . . .

Sec. 3.    That the Secretary of the Treasury, the Sec-
retary of Agriculture, and the Secretary of Commerce and
Labor shall make uniform rules and regulations for carry-
ing out the provisions of this act, including the collection
and examination of specimens of foods and drugs . . .
which shall be offered for sale in unbroken packages in
any state other than that in which they shall have been re-
spectively manufactured or produced. . . .

Sec. 10.    That any article of food, drug or liquor
that is adulterated or misbranded within the meaning of
this act, and is being transported from one state, territory,
district or insular possession to another, for sale, or having
been transported, remains unloaded, unsold, or in original
unbroken packages . . . shall be liable to be proceeded
against. . . .

Counsel for the state contend that the trial court
was in error in holding that the goods which defendant
sold were in original packages, and, further, that under the
agreed facts the articles which defendant had, became a
part of the general mass of property within the state and
were subject to its policy regulations.

From the agreed facts we extract the following as
bearing upon the issues of law presented:

On or about the 17th day of December, 1908, defend-
ant had in his possession in Iowa City, Johnson county,
Iowa, for the purpose of delivering in said county a certain
food product known as wheat flakes, the package or carton
of which bore the printed statement marked 16 ounces,
when in fact said package contained a less net weight than
16 ounces, the net weight of one of said packages be-
ing 12½ ounces; said defendant, J. B. Eckenrode, was
then and there in the employment of the Citizens' Whole-
sale Supply Company, a corporation organized under the
laws of Ohio, with its principal place of business at
Columbus, in said state, under the terms of a printed
contract, a copy of which is hereto attached marked, Ex-
hibit A.    In pursuance of said employment the said de-

fendant theretofore solicited orders from various residents of Iowa City; said orders being in writing, the following being a copy of the form used:

The Citizens' Wholesale Supply Company, Columbus, Ohio—Gentlemen: Please ship from your W. Ho. at Columbus, O., and deliver to me at the point indicated on the back of this order, the following bill of goods ordered from your salesman:

Packed only in AMT. QUANTITY Bulk goods packed AMT. QUANTITY L Regular sizes

R 5, 10, 15, 20, 25 lb. sizes.

| | |
|---|---|
| Natural Leaf Tea, | Roasted Gold R Blend Coffee, |
| Baking Powder, | Roasted, |
| Pepper, Cayenne, Ground, | Coffee Maker, |
| Allspice, Ground, | Coffee Mill, |
| Cloves, | Axle Grease—Golden Rule, |
| *    *    *    * | *    *    *    *    *    * |
| G. R. Medicines, (L) | *Fruit Jar, Wrench & Holder, |
| Old Colony, | Fruit Jar, Lid Straightener, |
| Root Beer, | C. G. R. Toothpicks, |
| G. R. Soda, | Crackers. |
| Ink, | Total Amount, |

*Sell both if possible.

Goods shipped to be as good as sample shown by salesman.

Name........................................

Post Office.................................:

In taking said orders each customer gave a separate order and each order contained a description of the particular goods ordered by said customer; said customers did not sign said orders, but the defendant himself signed the name of said customers to the same; each order bore a serial number for the purpose of identification and the purchase price of each item in each order was set opposite the item ordered; each order upon the reverse thereof contained its serial number, the date when taken, the amount of the order and name and address of the purchaser,

and the name of the salesman. Said orders were by said defendant forwarded by mail to the Citizens' Wholesale Supply Company, at Columbus, Ohio, daily as taken, and there accepted by the Citizens' Wholesale Supply Company. A duplicate of each order was left with the purchaser at the time the order was solicited, and at convenient times the Citizens' Wholesale Supply Company aggregated the orders received from the defendant, and selected in said city of Columbus, Ohio, the goods described in said order in sufficient quantities to fill all the orders received at that time. Said goods were then packed for shipment in boxes of convenient size, each box containing a number of packages ordered by said customers, and, in this particular case, each box containing a number of the packages of wheat flakes and other articles ordered by said customers. The contents of said boxes were composed exclusively of goods previously ordered in the manner hereinbefore described; but no particular package of wheat flakes was designated by any mark thereon as the property of any particular customer. Said boxes thus prepared for shipment were consigned to the defendant at Iowa City, Iowa, and delivered to a transportation company at said city of Columbus in said state of Ohio. Upon their arrival at Iowa City, Iowa, the defendant opened said boxes in a wareroom rented by said Eckenrode in pursuance of his said employment, in Iowa City, Iowa, and the contents of said boxes were taken therefrom as convenience in delivering required, and among the contents of which boxes were the packages of wheat flakes hereinbefore referred to and in controversy in this action. Said packages were then taken by said defendant and delivered to the persons in Iowa City, Iowa, who had given orders for the same. This delivery was made by taking sufficient numbers of packages to fill various orders taken from convenient localities and placed in a conveyance, and said conveyance was driven to the homes of the persons giving said orders and there the goods called for by said order were delivered to said customers respectively.

In the opening of said large boxes in said wareroom in Iowa City, the contents were taken out of the boxes and and were set about the room, as suited the convenience of defendant in making said delivery.

Upon the delivery of the goods ordered to the respec-

tive customers giving said orders, payment was made to said Eckenrode in cash therefor, in accordance with the terms of the order.

The Citizens' Wholesale Supply Company did not manufacture or pack the wheat flakes in question, but the same were manufactured and packed by the Lake Odessa Cereal Company, of Lake Odessa, Mich., and delivered by Eckenrode in the identical packages in which they were packed by said company. The said wheat flakes were purchased by the Citizens' Wholesale Supply Company from the said Lake Odessa Cereal Company under the written guaranty of said Lake Odessa Cereal Company that the wheat flakes and the packages containing them complied with the act of Congress of June 30, 1906, regulating interstate traffic in foods and drugs.

All goods, delivery of which was not accepted by the customers, were returned by the defendant to the Citizens' Wholesale Supply Company, at Columbus, Ohio.

The money collected by the defendant upon the delivery of said goods, less the expense of the delivery of the goods, and his commission for soliciting said orders in making said delivery in accordance with his contract of employment, was sent to the Citizens' Wholesale Supply Company at Columbus, Ohio and said defendant was under bond to the Citizens' Wholesale Supply Company to account for the moneys collected.

No delivery of goods was made by the defendant in Iowa City, Iowa, except as above stated and he had no goods in his possession for delivery, except under the circumstances above set out.

On or about the 17th day of December, 1908, while the defendant was in the act of making the delivery as above set forth, the packages of wheat flakes in question were delivered to M. E. Flynn, state food inspector, upon his request, and at the time said packages were delivered there were numerous packages of groceries and articles of food in packages strewn about the room from which said goods were delivered and where said goods were stored, but that all of said packages of groceries and other food products were shipped to and received by the defendant under the circumstances hereinbefore detailed and the same at the time of the making of the delivery were not in the

original unbroken shipping package in which they were shipped from Columbus, Ohio, to the defendant in Iowa City, Iowa.

We here copy such parts of Exhibit A, being the contract between the Supply Company and the defendant, as are deemed material:

### Regular Salesman's Contract.

This agreement entered into by and between the Citizens' Wholesale Supply Company, of Columbus, Ohio, as party of the first part, and J. B. Eckenrode, of Gettysburg, state of Pennsylvania, as party of the second part, witnesseth:

The said first party hereby agrees to employ the said second party as a traveling salesman to sell the goods and merchandise of the said first party for a period of one year from date of this agreement, and agrees to pay said party for his services as follows: Commissions on different classes of goods ranging from 5 percent to 50 percent, as per the regular terms of said first party, applying to classes L and R.

The said second party agrees to pay his board, all traveling expenses, and other expenses necessary to transact the business of the said first party, out of said commissions, and authorize any collector or acting collector in the service of the said first party to apply to the payment of said expenses, any part of said commissions before any part of said commissions shall be paid to the said second party.

The said first party agrees to make weekly cash advances to the second party, in accordance with the terms of General Circular No. 214, subject, 'Advance on Orders,' issued by the said first party.

The said first party agrees to furnish a sample case and all necessary samples of said merchandise to be sold by the said second party, and all stationery for his use in said business, free of charge, and the said second party on his part agrees to devote his entire time and attention to the exclusion of all other business, to furthering the interests and maintaining and increasing the trade of the

said first party, by all means in his power, and to stand
ready at any and at all times to represent the said first
party in any section or territory the said first party may
see fit to send him; and further agrees to obey such
orders and instructions as may from time to time be
issued to him by said first party, either direct or through
duly accredited foreman, general or special agents.

The said second party agrees in case of loss of said
sample case, samples and stationery, to pay to the said
first party the value thereof in a sum not to exceed twelve
dollars ($12.00).

The said second party further agrees to deposit with
the said first party the sum of one dollar as security, for
the regular price book of said first party, which sum will
be returned on surrendering said price book and samples
in reasonably good condition.

The said first party herein reserves the right to ter-
minate this contract at any time on the failure of the said
second party to comply with the conditions and require-
ments of this contract, or for any other cause deemed
sufficient by said first party.

There is considerable confusion in the cases regarding
what constitutes an original package, due largely to the
manner in which the question arose and somewhat to the
nature of the power which the state was attempting to
exercise. In previous cases we have, for the purpose of
arriving at a correct decision of the particular question at
issue, defined an original package. See *McGregor v. Cone,*
104 Iowa, 465, and cases cited. In that case it is said:

The question then arises, what is an 'original package'?
The definition commonly accepted and believed by us to be
correct, is that 'it is a bundle put up for transportation or
commercial handling, and usually consists of a number of
things bound together, convenient for handling and convey-
ance.' See *State v. Board of Assessors,* 46 La. Ann. 146 (15
South. 10, 49 Am. St. Rep. 318); *Keith v. State,* 91 Ala.
2 (8 South. 353, 10 L. R. A. 430); *U. S. v. One Hundred
and Thirty-Two Packages,* 22 C. C. A. 228 (76 Fed. 364).
In the case of *State v. Winters,* 44 Kan. 723 (25 Pac.

237, 10 L. R. A. 616), it is said: 'The original package was and is the package as it existed at the time of its transportation from one state to another.' It is quite apparent, we think that the words 'original package' have reference to the unit which the carrier receives, transports and delivers, as an article of commerce. The importer decides for himself the size of the package which he desires to import, and when he delivers it to the carrier for transportation he gives it the initial step, and from that time until sold in that form or broken, and transformed, it is the subject of interstate commerce. But when sold or broken, or when it changes form, it ceases to be an article of interstate commerce, and no longer enjoys this protection. The original package, then, is that package which is delivered by the importer to the carrier at the initial point of shipment, in the exact condition in which it was shipped. If sold, it must be in the form as shipped or received: for, if the package be broken after such delivery, it, by that act alone, becomes a part of the common mass of property within the state, and is subject to the laws of that state enacted in virtue of its police power.

In that case, however, the appellant was a resident of the state engaged in the business of selling cigarettes at retail. He purchased and imported the goods himself and resold them as his own. That these circumstances were regarded as important, if not controlling is manifest from this further excerpt from the opinion:

Here the appellant is a resident of the state, engaged in the business of selling cigarettes at retail, and as such is amenable to all its laws which do not deprive him of some constitutional right. When he received the package which had been made up by the manufacturer, and started upon its journey, he opened it and displayed its contents, not the package, for sale; and it affirmatively appears that he sold one of the small parcels from the original package to a customer who applied for the same. We think these distinguishing features are quite important; for if it be the rule that all imported goods, no matter how treated or sold, are exempt from state taxation or regulation, it is apparent that the state must forego the exercise of the

power of taxation and regulation, in cases where the right has never heretofore been questioned. See *State v. Wheelock,* 95 Iowa, 577.

As the question now before us involves a construction of the federal Constitution and Statutes we must follow the

1. INTERSTATE COMMERCE: what law governs.

decisions of the Supreme Court of the United States and not those of the state courts, nor the cases heretofore announced by us, if they be in conflict with the rules announced by the final arbiter of such matters.

In approaching the question it must be remembered that defendant was acting purely as an agent for a nonresident seller and not as a merchant or vendor. He merely

2. SAME: original packages: misbranded articles: pure food statute: enforcement.

took orders, made delivery of the goods, and accepted and received the purchase price for and on behalf of his principal, the Supply Company, and the proposition involved is his liability under the pure food laws of

the state. It is agreed that if he were the seller and his acts could be divorced from interstate commerce he would be guilty, because the packages which he sold were misbranded in that they did not contain the number of ounces stated on the outside of the cartons. So that we must determine whether or not, under the agreed facts, defendant's acts were of such a character as that our statute can not, under the decisions and rulings of the United States Supreme Court, be made applicable thereto. Several cases have gone to that court which involved similar facts to those presented in this case. In quoting from the opinions in these cases the distinction between sales made by the purchaser of goods imported by him and sales made by one as agent of a nonresident importer must be borne in mind. Giving due heed to this distinction apparent conflict in the rules announced disappears and the controlling principle is easily discovered.

In *Brown v. Maryland,* 25 U. S. 419 (6 L. Ed. 678) the court said:

It is sufficient for the present to say, generally that when the importer has so acted upon the thing imported that it has become incorporated and mixed up with the mass of property in the country, it has perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the state.

In *Low v. Austin,* 80 U. S. 29 (20 L. Ed. 517) we find the following:

Goods imported do not lose their character as imports and become incorporated into the mass of property of a state, until they have passed from the control of the importer, or been broken up by him from their original cases.

From the syllabus of *Leisy v. Hardin,* 135 U. S. 100 (10 Sup. Ct. 681, 34 L. Ed. 128) we quote as follows:

A statute of a state, prohibiting the sale of any intoxicating liquors, except for pharmaceutical, medicinal, chemical or sacramental purposes, and under a license from a county court of the state, is, as applied to a sale by the importer, and in the original package or kegs, unbroken and unopened, of such liquors manufactured in and brought from another state, unconstitutional and void, as repugnant to the clause of the Constitution granting to Congress the power to regulate commerce with foreign nations and among the several states.

From the opinion in that case, written by the Chief Justice, we make the following extract:

While by virtue of its jurisdiction over persons and property within its limits, a state may provide for the security of the lives, limbs, health and comfort of persons and the protection of property so situated, yet a subject-matter which has been confided exclusively to Congress by the Constitution is not within the jurisdiction of the police power of the state, unless placed there by Congressional

action. *Henderson v. Mayor,* 92 U. S. 259 (23 L. Ed. 543); *Railroad Co. v. Husen,* 95 U. S. 465 (24 L. Ed. 527); *Walling v. Michigan,* 116 U. S. 446 (6 Sup. Ct. 454, 29 L. Ed. 691); *Robbins v. Taxing District,* 120 U. S. 489 (7 Sup. Ct. 592, 30 L. Ed. 694).

Hence, inasmuch as interstate commerce, consisting in the transportation, purchase, sale and exchange of commodities, is national in its character, and must be governed by a uniform system, so long as Congress does not pass any law to regulate it, or allowing the states so to do, it thereby indicates its will that such commerce shall be free and untrammeled. County of *Mobile v. Kimball,* 102 U. S. 691 (26 L. Ed. 238); *Brown v. Houston,* 114 U. S. 622, 631 (5 Sup. Ct. 1091, 29 L. Ed. 257); *Railroad Co. v. Illinois,* 118 U. S. 557 (7 Sup. Ct. 4, 30 L. Ed. 244).

From the syllabus to *Vance v. Vandercock,* 170 U. S. 438 (18 Sup. Ct. 674, 42 L. Ed. 1100) we quote the following:

The right to send liquors from one state into another, and the act of sending the same, is interstate commerce, the regulation whereof has been committed by the Constitution of the United States to Congress; and hence, that a state law which denies such a right, or substantially interferes with or hampers the same, is in conflict with the Constitution of the United States. The power to ship merchandise from one state into another carries with it, as an incident, the right in the receiver of the goods to sell them in the original packages, any state regulation to the contrary notwithstanding; that is to say, that the goods received by interstate commerce remain under the shelter of the interstate commerce clause of the Constitution, until by a sale in the original package they have been commingled with the general mass of property in the state.

In *May v. New Orleans,* 178 U. S. 496 (20 Sup. Ct. 976, 44 L. Ed. 1165) it appeared that May & Co., merchants at New Orleans, were engaged in the business of importing goods from abroad, and selling them. In each

box or case in which they were brought into this country, there would be many packages, each of which was separately marked and wrapped. The importer sold each package separately. The city of New Orleans taxed the goods after they reached the hands of the importer (the duties having been paid) and were ready for sale. Held, that the box, case or bale in which the separate parcels or bundles were placed by the foreign seller, manufacturer or packer was to be regarded as the original package, and when it reached its destination for trade or sale and was opened for the purpose of using or exposing to sale the separate parcels or bundles, the goods lost their distinctive character as imports, and each parcel or bundle became a part of the general mass of property in the state, and subject to local taxation.

Generally speaking, these are the cases relied upon by counsel for the state, and it is apparent that none of them reach the exact proposition presented by the record in the instant case. There are decisions from that court which, to our minds, clearly rule the one now before us. They commence probably with the *State Freight Tax Cases,* 15 Wall. 232, 21 L. Ed. 146) and conclude perhaps with Rearick v. Penn., 203 U. S. 507 (27 Sup. Ct. 159, 51 L. Ed. 295). From some of these we shall quote to demonstrate how closely they are in point. For example, in *Bowman v. Railroad Co.,* 125 U. S. 465 (8 Sup. Ct. 689, 1062, 31 L. Ed. 700) the court said:

Beyond all question, the transportation of freight, or of the subjects of commerce, for the purpose of exchange or sale, is a constituent of commerce itself. . . . It would be absurd to suppose that the transmission of the subjects of trade from the state to the buyer, or from the place of production to the market, was not contemplated, for without that there could be no consummated trade, either with foreign nations or among the states . . . nor does it make any difference whether this interchange of commodities is by land or by water. In either case the

bringing of the goods from the seller to the buyer is commerce.

In *Gloucester Ferry Co. v. Pennsylvania,* 114 U. S. 196 (5 Sup. Ct. 826, 29 L. Ed. 158) the court said:

The means of transportation of persons and freight between the states does not change the character of the business as one of commerce, nor the time within which the distance between the states may be traversed. The power of Congress to regulate commerce also embraces within its control all the instrumentalities by which that commerce may be carried on, and the means by which it may be aided and encouraged.

There are two cases from that court so nearly in point and so conclusive that without noting others we shall make liberal quotations from these two, because we find therein the rules which govern the case now before us. These decisions are *Caldwell v. North Carolina,* 187 U. S. 622 (23 Sup. Ct. 229, 47 L. Ed. 336) and *Rearick v. Pennsylvania,* 203 U. S. 507 (27 Sup. Ct. 159, 51 L. Ed. 295). In the former Judge Shiras, writing the opinion, said:

The defendant, Caldwell, being employed by the Chicago Portrait Company, of Chicago, Ill., went to Greensboro for the purpose of delivering certain pictures and frames for which contracts of sale had previously beeen made by other employees of the Chicago Portrait Company, who had preceded the defendant in Greensboro. The defendant went to the Southern Railway freight station and took therefrom large packages of pictures and frames which had been shipped to Greensboro, N. C., addressed to the Chicago Portrait Company, carried these packages to his rooms in the Woods House, a hotel in the city of Greensboro, and there broke the bulk, placing said pictures in their proper frames, and from this point delivered the pictures, one at a time, to the purchasers in the city of Greensboro. The defendant had been engaged in this work two days when arrested.

The state Supreme Court endeavored to distinguish the present case from that of *Brennan v. Titusville,* 153 U. S. 189 (14 Sup. Ct. 829, 38 L. Ed. 719) in the following observations: 'The defendant insists that *Brennan v. Titusville* is directly in point, . . . is, in every essential fact, this case . . . and should control the opinion of the court on this appeal. And it is in many respects like this case, but there is one material difference between that case and this, which marks the distinction. In this case they were shipped by the Chicago Company to itself in the city of Greensboro; and when they reached Greensboro, the defendant as the agent of the Chicago Company, received them from the railroad at its depot, carried them to its room in Greensboro, opened the boxes in which they were shipped, took out the pictures and frames, assorted them and put them together, and delivered them to the purchasers in the city of Greensboro, and had been engaged in this work two days when arrested. If they had been completed and shipped directly to the parties for whom they were intended, this case would have fallen within the decision of *Brennan v. Titusville,* and we should so hold as it was held there that it was an interference with interstate commerce, and that the defendant was not guilty. But to our minds, there is a decided difference between this case and that. The contract to make and deliver these pictures was an executory contract, and no title passed by this contract. If they had been completed in Chicago, and under contract shipped to the purchaser, the title would have passed to the consignee upon delivery to the railroad in Chicago, the railroad being deemed to be the agent of the consignee, and *Brennan v. Titusville* would have applied, as the tax would then have been upon the commerce. But instead of completing the pictures in Chicago and shipping them to the parties who had contracted for them, they were shipped to itself, the Chicago Portrait Company, in Greensboro. This being so, no title ever passed from the Chicago Portrait Company, until the pictures were put in the frames and delivered by the defendant. These pictures belonged to the Chicago Company when they were shipped from Chicago, and belonged to it when they got to Greensboro, and the question is, could the Chicago Portrait Company, because it was a foreign

corporation, engage in the business of completing these pictures, and in selling and delivering them in Greensboro, without becoming liable to a city tax for which its own citizens would be liable? It seems to us that it could not.'

Mr. Justice Shiras, after quoting the foregoing from the opinion of the Supreme Court of North Carolina, said:

We are not persuaded by this reasoning. It seems to proceed from two propositions: First, that the pictures in question were not completed before they were brought to Greensboro; and, second, that the articles were not shipped directly to the purchasers, but to an agent of the senders in Greensboro. But it certainly can not be pretended that if the pictures and the disconnected frames had been directly shipped to the purchasers, the license tax could have been imposed either on the vendor out of the state or the purchaser within the state. If the pictures and the frames intended for them had been shipped directly to the purchasers, whether in the same or separate packages, such a transaction would, beyond question, be interstate commerce beyond the reach of the taxing power of the state. It is too plain for argument that the supposed incomplete condition of articles of commerce, if shipped directly to the purchasers can not subject them to a license tax. But we are not disposed to concede that, under the facts of this case, the pictures were, in any proper sense, incomplete when received in Greensboro. That the frames and the pictures were in separate packages, if such was the case, was merely for convenience in packing and handling, and placing the pictures in their proper places (the language of the verdict) meant that each picture was placed in the frame designed for it. . . .

Nor does the fact that the articles were not shipped separately and directly to each individual purchaser, but were sent to an agent of the vendor at Greensboro, who delivered them to the purchasers, deprive the transaction of its character as interstate commerce. It was only that the vendor used two instead of one agency in the delivery. It would seem evident that, if the vendor had sent the articles by an express company, which should collect on delivery, such a mode of delivery would not have subjected

the transaction to state taxation. The same could be said if the vendor himself, or by a personal agent, had carried and delivered the goods to the purchaser. That the articles were sent as freight by rail, and were received at the railroad station by an agent, who delivered them to the respective purchasers, in no wise changes the character of the commerce as interstate. Transactions between manufacturing companies in one state, through agents, with citizens, of another constitute a large part of interstate commerce; and for us to hold, with the court below, . . . that the same articles, if sent by rail directly to the purchaser, are free from state taxation, but if sent to an agent to deliver are taxable through a license tax upon the agent, would evidently take a considerable portion of such traffic out of the salutary protection of the interstate commerce clause of the Constitution.

Even more closely in point is the *Rearick Case,* from which we quote as follows:

The following is a shortened statement of the facts agreed: An Ohio corporation employed an agent to solicit in Sunbury, retail orders to the company for groceries. When the company had received a large number of such orders it filled them at its place of business in Columbus, Ohio, by putting up the objects of the several orders in distinct packages and forwarding them to the defendant by rail, addressed to him for 'A. B.,' the customer, with the number of the order also on the package for further identification. The company ultimately kept the orders, but it kept no book accounts with the customers, looking only to the defendant. The defendant alone had authority to receive the goods from the railroad, and when he received them he delivered them, as was his duty, to the customers for cash paid to him. He then sent the money to the corporation. The customer had the right to refuse the goods if not equal to the sample shown to him when he gave the order. In that or other cases of nondelivery the defendant returned the goods to Columbus. No shipments were made to defendant except to fill such orders, and no deliveries were made by him except to the parties named on the packages. In the case of brooms, they were tagged

and marked like the other articles, according to the number ordered, but they then were tied together into bundles of about a dozen, wrapped up conveniently for shipment. The defendant had no license, but relied upon the invalidity of the ordinance, as we have said.

If the acts of the plaintiff in error were done in the course of commerce between several states, the law is established that his request for a ruling was right, and that he should have been discharged. *Robbins v. Shelby County Taxing District,* 120 U. S. 489, 497 (7 Sup. Ct. 592, 30 L. Ed. 694); *Leisy v. Hardin,* 135 U. S. 100 (10 Sup. Ct. 681, 34 L. Ed. 128); *Caldwell v. North Carolina,* 187 U. S. 622 (23 Sup. Ct. 229, 47 L. Ed. 336). It will be seen from the insertion of the statement concerning the brooms that a ground relied upon by the prosecution to avoid that conclusion was that the goods, or at least this part of them, were not in the original packages when delivered, and that therefore the case did not fall within the decisions last cited, but rather within *Austin v. Tennessee,* 179 U. S. 343 (21 Sup. Ct. 132, 45 L. Ed. 224); *Cook v. Marshall County,* 196 U. S. 261 (25 Sup. Ct. 233, 49 L. Ed. 471); *May v. New Orleans,* 178 U. S. 496 (20 Sup. Ct. 976, 44 L. Ed. 1165). In other words, it was contended that the brooms, before they were sold, had become mingled with, were part of, the common mass of goods in the state, and so subject to the local law. But the doctrine as to original packages primarily concerns the right to sell within the prohibiting or taxing state goods coming into it from outside. When the goods have been sold before arrival, the limitations that still may be found to the power of the state will be due, generally, at least, to other reasons, and we shall consider whether the limitations may not exist, irrespective of that doctrine, in some cases where there is no executed sale. Hence the prosecution, whatever its assumption on the point last mentioned, sought to show that there was no sale, until the goods were delivered and the cash paid for them. The superior court contented itself with the suggestion that the contract would have been satisfied by the delivery of articles corresponding to the sample, although bought at the next door. The argument submitted to us goes farther, and affirms that the order was not accepted and did not bind the corporation until the delivery took place.

The answer to the latter of the two positions just stated is simple. The fair meaning of the agreed 'fact that the orders were given to agents employed to solicit them, is that the company offered the goods and that the orders were acceptances of offers from the other side. If there were the slightest reason to doubt that the contracts were made with the .company through its authorized agent at the moment when the orders were given, which we do not perceive that there is, certainly the contrary could not be assumed in order to sustain a conviction. It is for the prosecution to make out its case. We may mention here in parenthesis that, of course, it does not matter to the question before us that the contract was made in Pennsylvania. *Brennan v. Titusville,* 153 U. S. 289 (14 Sup. Ct. 829, 38 L. Ed. 719). . . .

Commerce .among the several states is a practical conception not drawn from the 'witty diversities' (Yelve, 33) of the law of sales. *Swift & Co. v. United States,* 196 U. S. 375, 398 and 399 (25 Sup. Ct. 276, 49 L. Ed. 518). The brooms were specifically appropriated to specific contract, in a practical, if not in a technical sense. Under such circumstances it is plain that, wherever might have been the title, the transport of the brooms for the purpose of fulfilling the contracts was protected commerce. In *Brennan v. Titusville,* 153 U. S. 289 (14 Sup. Ct. 829, 38 L. Ed. 719) pictures were sold by sample, as the brooms were here, and although the pictures were consigned to the purchasers directly, the railroad collecting the price, there was no discussion of the question whether the title had passed. In *American Express Company v. Iowa,* 196 U. S. 133, 143 (25 Sup. Ct. 182, 49 L. Ed. 417) that question was referred to only to be waived. In *Caldwell v. North Carolina,* 187 U. S. 622 (23 Sup. Ct. 229, 47 L. Ed. 336) the pictures were consigned to the defendant, an agent, as here, with the additional facts that the pictures and frames were sent in large packages which were opened by the agent on their arrival, and that the pictures, then, for the first time, were put into their proper frames, and for all that appears, then for the first time, appropriated to specific purchasers.

These two excerpts are so conclusive upon the proposi-

tion now before us that there is little left for further discussion. For the purposes of this case it will be observed that they delimit the original package theory as applied to the facts in the record now before us. These cases have been followed by other courts and in other jurisdictions as will be seen from the following citations: *In re Spain* (C. C.) 47 Fed. 208 (14 L. R. A. 97); *In re Tyerman* (C. C.) 48 Fed. 167; *City of Huntington v. Mahan,* 142 Ind. 695 (42 N. E. 463, 51 Am. St. Rep. 200); *Tax Collector v. Pettigrew,* 44 La. Ann. 356 (10 South. 853); *State v. Willingham,* 9 Wyo. 290 (62 Pac. 797, 52 L. R. A. 198, 87 Am. St. Rep. 948); *Stone v. State,* 117 Ga. 292 (43 S. E. 740); *Menke v. State,* 70 Neb. 669 (97 N. W. 1020); *Wilcox v. People,* 46 Colo. 382 (104 Pac. 408). Following the decisions of the Supreme Court of the United States it is apparent that defendant can not be convicted of a violation of our pure food statutes under the agreed facts.

We shall not, for reasons already stated, discuss the limitations upon the police power of the state. Doubtless the attitude of the Attorney-General with reference to this matter is due in part to the decisions of the Federal Supreme Court in *Leisy v. Hardin,* supra. *New Orleans Co. v. Light Co.,* 115 U. S. 650 (6 Sup. Ct. 252, 29 L. Ed. 516); *Henderson v. Mayor,* 92 U. S. 259 (23 L. Ed. 543); *Railroad Co. v. Husen,* 95 U. S. 465 (24 L. Ed. 527); *Walling v. Mich.,* 116 U. S. 446 (6 Sup. Ct. 454, 29 L. Ed. 691) and other like cases. There is no subject more perplexing than that of the limitations upon the police power of the state and we shall not attempt a discussion thereof without full argument by counsel. There is no occasion to decide the matter now, for it is not argued and this opinion should not be regarded as settling the matter for this jurisdiction. Whatever our individual views of the question upon principle, or however we may regard some of the decisions of the United States Supreme Court

upon this proposition, is now immaterial; for the matter is not presented on this appeal.

The decision of the trial court seems to be correct, and it is *affirmed*.